**ULMER, Admr., Appellant,**

**v.**

**ACKERMAN, Appellee, et al.**

[Cite as *Ulmer v. Ackerman* (1993), 87 Ohio App.3d 137.]

Court of Appeals of Ohio,
Allen County.

No. 1–92–69.

Decided April 8, 1993.

138

*Jeffrey Lee Reed,* for appellant.

*Lawrence S. Huffman,* for appellee.

THOMAS F. BRYANT, Judge.

This is an appeal by the personal representative of Isreal Ulmer, deceased ("plaintiff"), from the judgment entered by the Court of Common Pleas of Allen County directing a verdict for defendant-appellee ("Ackerman") and dismissing the complaint.

On March 5, 1990, during surgery to Isreal Ulmer, Ackerman, an anesthesiologist, administered the anesthesia using an endotracheal tube. Ulmer died during post-surgery care.

In her complaint against Ackerman, plaintiff alleged medical malpractice causing Ulmer's death. Specifically, plaintiff asserted that Ulmer's death was caused by Ackerman's premature removal of the endotracheal tube.

At trial, after presentation of plaintiff's evidence was concluded, the trial court granted Ackerman's timely motion for a directed verdict pursuant to the rule.

Plaintiff appeals from that judgment, asserting two assignments of error. The first assignment of error is:

"I. The trial court erred when it granted a directed verdict for the appellee in light of the appellant's evidence, including inferences therefrom, that appellee deviated from the standard of care, which deviation, in probability, directly and proximately caused the appellant's decedent's death."

Civ.R. 50(A)(4), governing the granting of motions for directed verdicts at the close of plaintiff's evidence, provides:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

Plaintiff argues that plaintiff's evidence adduced at trial, when construed most strongly in favor of plaintiff against whom Ackerman's motion was made,

established that Ackerman's departure from the proper standard of medical care was the proximate cause of Ulmer's death.

■ Our review of a judgment granting a motion for a directed verdict is also governed by Civ.R. 50. Neither we nor a trial court may weigh the evidence or assess the credibility of the witnesses when considering a motion for a directed verdict. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467.

In *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131–132, 75 O.O.2d 184, 186–187, 346 N.E.2d 673, 677, the Supreme Court of Ohio identified the elements of the cause a plaintiff must prove to establish medical malpractice, stating:

"Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things. [Citations omitted.]

" * * * *

"Proof of the recognized standards must necessarily be provided through expert testimony."

■ Thus, to summarize, in order to maintain a cause of action in medical malpractice, three elements must be proved. Plaintiff must establish the applicable standard of care, usually through expert testimony; show a negligent failure on the part of the defendant to render treatment in conformity with the standard of care; and demonstrate that the resulting injury was proximately caused by defendant's negligence. *Bruni v. Tatsumi, supra,* paragraph one of the syllabus.

■ The applicable standard of care for a physician in the practice of a board-certified medical specialty is that of a reasonable specialist, practicing in the same specialty, and considering the state of scientific knowledge existing in the field when the alleged malpractice occurred. *Bruni v. Tatsumi, supra,* paragraph two of the syllabus.

■ Here, the record discloses that the trial court, in granting Ackerman's motion, reasoned that plaintiff failed to establish by expert testimony to a reasonable degree of medical "probability" that Ackerman's departure from the correct standard of care proximately caused Ulmer's death. The trial court noted

further that plaintiff also failed to establish that Ulmer would have survived but for Ackerman's departure from the standard of care.

Plaintiff's expert, Alexis Michael de Rosayro, M.D., having been qualified as an expert in the field of anesthesiology, testified on direct examination as follows:

"Q.  Generally, can you tell the jury what the administration of anesthesiology [*sic*] does to one's respiratory system?

"A.  I think that's somewhat of a broad question to answer.  But in general terms I would say the administration of anesthesia tends to depress the respiratory system of any patient and we may subsequently need to control the respiration because of the depressant effect of the medication that are [*sic*] administered."

The testimony of plaintiff's expert anesthesiologist, based on review of Ulmer's hospital and medical records, disclosed that nothing eventful or remarkable occurred during the course of Ulmer's surgery, and that Ulmer was taken from surgery to the recovery room under Ackerman's postoperative care, with the endotracheal tube still in place as it had been for the administration of anesthetic during surgery.  Another series of questions and answers followed:

"Q.  Doctor, according to the records, when Mr. Ulmer was taken to the recovery room, was the endotracheal tube still in place?

"A.  It was.

"Q.  Is that a standard practice?

"A.  It is not unusual.

"Q.  What would be the purpose of leaving it there?

"A.  The purpose generally is if the patient is not responsive, if his conscious level is such that the anesthesiologist might not feel comfortable in removing that tube and subjecting that patient to airway obstruction, or if he wishes to have better control of the patient's airway."

Subsequent direct examination then established:

"Q.  Doctor, now I want to ask you a question, and I want you to base your answer upon your personal review of the medical records and the depositions and the letters that you indicated that you reviewed.  First of all, I want to ask you if you have an opinion based upon your review of those records as to whether or not the standard of care for the administration of anesthesiology to Isreal Ulmer, or the standard of care in the care and treatment of Mr. Ulmer by the Defendant anesthesiologist was deviated from in this case?

"A.  Yes, I do.

"Q.  And what is your opinion?

"A.   My opinion, given all the facts and the circumstances in the—recorded in the medical records, that the patient was extubated or the tube was removed prematurely in the face of a patient who had been not shown to be breathing adequately prior to that removal of the tube.

"Q.   And what from the record can you specifically point out for your reasons for rendering that opinion on [sic]?

"A.   The reasons are based on the fact that the patient was unconscious at 12:25 admission to the recovery room, the patient's respirations were indicated to be shallow and not at the level that one would like it to be, which is to be able to breathe freely.   Subsequently, the patient's respirations ten minutes later were noted to be choppy, sufficiently so obviously to require assistance in order to improve the oxygen delivery to the lungs.   And again, based on the subsequent events where even following re-intubation the saturation was dangerously low at seventy percent.

"Q.   Based upon the same review of all the medical records and documents, do you have an opinion whether the deviation by the Defendant anesthesiologist from the standard of care caused Mr. Ulmer's death?

"A.   I believe it did.

"Q.   And what is the basis for that opinion, Doctor?

"A.   The basis is as I've already outlined, together with the fact that the patient did not respond—Mr. Ulmer did not respond to cardiopulmonary resuscitation.

"Q.   * * * [D]o you * * * have an opinion as to whether the Defendant anesthesiologist charged with Mr. Ulmer's care in this case deviated from the standard of care for an anesthesiologist?

"A.   Yes.   I think I already answered that.

"Q.   Okay.   And for the record, in response to my hypothetical, what is your opinion?

"A.   My opinion, as I stated before, was that the endotracheal tube was removed prematurely.

"Q.   * * * [D]o you have an opinion as to whether the actions by the Defendant anesthesiologist caused Isreal Ulmer's death?

"A.   Yes.

"Q.   And having an opinion, what is your opinion?

"A.   My opinion is that they did cause his death.   Ultimately led to his death."

The expert's testimony does not explain how the departure from the standard of care caused the death. However, we believe that the testimony of plaintiff's expert, when construed most strongly in plaintiff's favor, was sufficient to defeat Ackerman's motion for directed verdict. The expert testified expressly that in his expert opinion Ackerman departed from the anesthesiologist's standard of care and by doing so caused the death of Ulmer.

The trial court, in granting the motion for directed verdict, mistakenly relied on *Cooper v. Sisters of Charity* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97, as requiring plaintiff's showing by expert testimony that Ulmer would have survived his surgery and postoperative difficulties but for the negligence of the anesthesiologist. In the matter at hand, however, where no other alternative save decedent's death may be inferred from the defendant's conduct according to expert medical testimony, no occasion arose for disproof of other alternatives, as in the case of the claimed wrong diagnosis and ensuing wrong treatment of the dying patient in *Cooper*. The issue of whether the physician's misjudgment precluded an alternative certain chance of survival is not presented. *Cooper v. Sisters of Charity, id.* at 252, 56 O.O.2d at 151, 272 N.E.2d at 103, reiterates the well-settled rule that establishment of proximate cause through expert medical testimony must be by probability. At a minimum, the opinion testimony must provide the trier of fact with evidence that the injury claimed was more likely than not caused by defendant's negligence. We believe the rule of *Cooper* is satisfied to the extent applicable to the case at bar by expert testimony unequivocally establishing defendant's conduct as the sole cause of the patient's death.

The trial court held and Ackerman urges here as in the trial court that the plaintiff's expert's testimony is insufficient to establish malpractice and probable cause with the requisite degree of certainty because it is not expressed in terms of "probability." The plaintiff's expert did not use and was not asked in questioning to adopt the word "probable" in expressing his opinion of the proximate causation of Ulmer's death.

While the trial court correctly observed this court's adherence to the settled rule requiring that proximate causation be established by probability, that court's reliance on our opinion in *Koehler v. Mayfield* (Dec. 5, 1991), Marion App. No. 9–990–19, unreported, 1991 WL 259547, is misplaced insofar as *Koehler* is implied to require the verbalization of any particular word or words of art to establish proximate cause to the requisite degree of certainty. In *Koehler* we followed the general rule holding that speculative words or words of mere possibility such as "could" are insufficient to establish probability. See, *e.g., Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 368, 28 OBR 429, 430, 504 N.E.2d 44, 45. There is no mandatory technical requirement to use a particular word

such as "probable" or "probability" to state the obvious. The appropriate means of challenging the credibility of such testimony is cross-examination.

When a qualified medical expert in the defendant's specialty testifies as here, that the defendant's departure from the accepted standard of care of that medical specialty caused the death of a patient, the establishment of the sole cause of death necessarily imports that the individual would have survived absent the departure from the standard of care. No more is required of plaintiff to establish proximate cause and a prima facie case of medical malpractice.

■ Finally, as to Ackerman's challenge to the quality of the testimony of plaintiff's expert, we note that the issue of whether an expert's testimony is inconsistent with testimony he has given on an earlier occasion is a matter for the trier of facts to weigh when assessing the credibility of the witness. See *Strother, supra.*

We hold that the trial court erred by granting Ackerman's motion for directed verdict, for as we apply the rules we have discussed, when construing the plaintiff's evidence most strongly in plaintiff's favor, reasonable minds can come to more than one conclusion concerning whether or not Ackerman negligently departed from the anesthesiologist's standard of care and thereby proximately caused Ulmer's death.

■ Plaintiff's first assignment of error is well taken.

Plaintiff's second assignment of error is:

"II. The trial court erred in permitting the introduction of evidence of the adoption of decedent's minor child, which adoption occurred after decedent's death."

Plaintiff argues that the trial court erred by allowing defense counsel to introduce evidence concerning the adoption of Ulmer's minor daughter by her stepfather after Ulmer's death. We agree.

Ackerman tacitly concedes the impropriety of the inquiry at issue, but urges this court to refrain from deciding the assignment of error, considering it to be moot if the first assignment of error should be overruled. The issue is not moot, however, and as pointed out by plaintiff, when a wrongful death action such as this is brought pursuant to R.C. 2125.02(A)(3)(a), "[t]he date of the decedent's death fixes * * * the status of all beneficiaries of the action for purposes of determining the damages suffered by them and the amount of damages to be awarded."

R.C. 3107.15(B) states, in part:

" * * * [I]f a parent of a child dies without the relationship of parent and child having been previously terminated and a spouse of the living parent thereafter

adopts the child, the child's rights from or through the deceased parent for all purposes, including * * * applicability or construction of * * * statutes * * * are not restricted or curtailed by the adoption."

Therefore, because R.C. 2125.02(A)(3)(a) clearly fixes the status of Ulmer's daughter at the time of his death before her adoption, and because R.C. 3107.15(B) expressly states that a child's statutory rights derived from and through a deceased parent are not restricted by that child's subsequent adoption, we hold that it was error prejudicial to plaintiff to allow the introduction of evidence of the adoption of Ulmer's minor daughter to imply limitation of her loss or for other purpose.

Plaintiff's second assignment of error is well taken.

Because we find error in the record prejudicial to plaintiff as assigned and argued, the judgment of the Court of Common Pleas of Allen County directing a verdict for Ackerman is reversed and the cause is remanded to that court for further proceedings.

*Judgment reversed*
*and cause remanded.*

HADLEY and SHAW, JJ., concur.