[Cite as *Geletka v. MetroHealth Sys.*, 2023-Ohio-934.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

DEBORAH GELETKA,                                    :

    Plaintiff-Appellant,                    :

                                    No. 111942

    v.                                      :

METROHEALTH SYSTEMS, ET AL.,      :

    Defendants-Appellees.                 :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 23, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-919242

---

### *Appearances:*

Thomas J. Misny, M.D., Inc., and Thomas J. Misny, *for appellant*.

Buckingham, Doolittle & Burroughs, LLC, Timothy A. Spirko, and Dirk E. Riemenschneider, *for appellees*.

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Plaintiff-appellant Deborah Geletka ("Geletka") appeals the decision of the Cuyahoga County Court of Common Pleas granting a directed verdict in favor of defendant-appellee Kevin L. Grimes, M.D. (" Dr. Grimes"). Geletka also appeals the

trial court's denial of her motion for a new trial. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} In August 2019, Geletka filed a medical-malpractice complaint seeking damages from MetroHealth System ("MetroHealth") and Dr. Grimes. In the complaint, Geletka alleged that Dr. Grimes, who was employed by MetroHealth, was negligent in the treatment of a mass located on her upper left leg. Particularly, she alleged that Dr. Grimes erroneously diagnosed the mass as a hernia and performed a surgical procedure on October 18, 2018, where he inserted a four-inch by one-inch polypropylene mesh plug in the area. After the surgery was completed, Geletka noticed that the mass that she thought was the hernia was still present. An ultrasound was ordered, and the results demonstrated that the mass that Geletka was concerned about was a saphena varix, related to her varicose veins. Geletka alleged that the mesh insertion was unnecessary because she did not actually have a hernia and that the mesh may need to be removed in the future because the mesh will fibrose and scar. Finally, she alleged that Dr. Grimes purposely covered up his own medical malpractice in his office medical records.

{¶ 3} The parties engaged in discovery and in August 2020, MetroHealth and Dr. Grimes filed a motion for partial summary judgment as to Geletka's request for punitive damages. Extensive briefing ensued and in November 2020, the trial court granted summary judgment as to the punitive damages against MetroHealth but

denied summary judgment as to the punitive damages against Dr. Grimes, noting that genuine issues of material fact remained.

{¶ 4} Trial commenced on August 2, 2022. We will briefly summarize the relevant procedural discussions and evidence received at trial.

{¶ 5} During opening statements, Geletka's counsel explained that the evidence would show that Dr. Grimes misdiagnosed a saphena varix, related to the body's vascular system, as a femoral hernia. Counsel explained that after the mesh insertion, Geletka experienced significant bruising and pain. After the bruising and pain subsided, Geletka noted that the lump that the surgery was purposed to remove was still present on her leg. Geletka's counsel suggested that it was below the standard of care for Dr. Grimes to continue to operate on Geletka after making the incision and finding that there was no hernia in Geletka's body. Counsel claimed that because of the allegedly unnecessary mesh insertion, Geletka endured pain and suffering, clarifying that these were the only damages that Geletka sought in this case.

{¶ 6} During his opening statement, counsel for Dr. Grimes explained that Geletka is a patient with chronic pain and that Dr. Grimes met the standard of care every step of the way. Dr. Grimes's counsel particularly noted that the initial exam of the lump in Geletka's thigh met the standard of care in making a typical hernia diagnosis. After Geletka was diagnosed with a hernia by Dr. Grimes, she presented to the emergency room complaining of pain in that area. The emergency room doctor also diagnosed the lump as a hernia, though the CT scan taken in the

emergency department reflected that there was no hernia. From these facts, Dr. Grimes's counsel describes Dr. Grimes's defense: Geletka indeed had a hernia and it was properly operated on and this hernia was separate and distinct from the saphena varix.

{¶ 7} After opening statements, Dr. Grimes's counsel requested a sidebar and brought an issue to the trial court's attention. Dr. Grimes's counsel stated that Geletka had not provided them with an exhibit list, so counsel did not know what records Geletka would be introducing and, therefore, was concerned that counsel would not be able to stipulate to the authenticity of any medical records that Geletka introduced at trial. The trial court informed Geletka's counsel that he would have to properly authenticate the records prior to utilizing them at trial, whether that was by working with Dr. Grimes's counsel to achieve a stipulation or bringing in the records custodian to testify. At the conclusion of the sidebar, Geletka's counsel assured the trial court that he would not be using any medical records that day and promised the trial court that he would straighten it out by the next day of trial.

{¶ 8} Geletka's first witness and her sole expert in this case, Dr. Mark Liberman ("Dr. Liberman"), was sworn in and testified via videoconference. Dr. Liberman went through his qualifications, and the court qualified him as an expert witness in general surgery. Dr. Liberman then discussed saphena varices and hernias generally. Relevant to this case, Dr. Liberman testified that hernias have three components: a neck, a sac, and any tissue or organ that protrudes through the neck into the hernia sac. (Tr. 114.) He further testified that once a hernia sac is

pushed through the femoral ring, it is "scarred" there. (Tr. 116.) In other words, it does not resolve without operation, but could move further through the ring and become larger. He testified that if a doctor operates on a hernia, a doctor expects to find "[a] hernia sac through a defect." (Tr. 117.) Dr. Liberman noted that upon review of Dr. Grimes's surgical notes, Dr. Grimes did not note that he found a hernia sac. He then testified that because Dr. Grimes did not find a sac, Geletka must not have had a hernia and, therefore, the insertion of the mesh was below the standard of care because "the best you can hope for is no harm; but the problem is people can have problems with having mesh, mesh plugs, and so you put the patient at potential risk for having a foreign body that they don't need and there's no indication for." (Tr. 118.) Dr. Liberman generally testified about potential risks of mesh insertion, including nerve entrapment and pain.

{¶ 9} When questioned directly about Geletka's injuries as a result of the unnecessary surgery, Dr. Liberman suggested that any pain directly caused by the mesh would be due to the surgeon's negligence in performing an unnecessary surgery, but that pain from the operation itself, including at the incision site, would not be part of her injuries as a result of the surgeon's negligence. He stated, "I do not feel he was negligent taking her to the operating room. The negligent part was putting in the mesh." (Tr. 125.) Notably, he did not specify whether Geletka herself suffered any specific injuries as a result of this mesh insertion.

{¶ 10} On cross-examination, Dr. Liberman testified that it was his understanding that the mesh plug was causing Geletka pain on palpation, based on

Geletka's own testimony, but not based on his review of any medical records. He also testified that had there actually been a hernia, Dr. Grimes would have met the proper standard of care at all points, but because he believed there was no hernia, he could not opine that Dr. Grimes met the standard of care in inserting the mesh. He conceded that a saphena varix and a hernia could exist at the same time. Dr. Liberman did not agree that a hernia could exist without a sac, as suggested by Dr. Grimes's defense counsel. Defense counsel also showed Dr. Liberman a medical record from January 8, 2020, where Geletka presented to Dr. John J. Como. The medical record indicated that Geletka had a "painful left groin lymph node" that she has noted since June 2019, about nine months after the hernia surgery, and that the lymph node is "abutting" the hernia mesh. Dr. Liberman confirmed that these lymph node complaints would not have been related to the hernia, stating that "[t]he lymph nodes are different than a hernia." (Tr. 150.)

{¶ 11} On redirect examination, Geletka's counsel asked Dr. Liberman about the lymph node complaints that Geletka had beginning in June 2019. Dr. Liberman testified that typically, lymph nodes develop when there is inflammation, and that inflammation typically happens in areas that are infected or irritated and can cause pain. He testified that the lymph node abutting the mesh indicates that the body is "reacting" to the mesh. (Tr. 182.)

{¶ 12} Geletka herself testified next. She relayed that she used to work as a medical lab technician at MetroHealth and has some familiarity with human anatomy because of her career and schooling. She testified that she presented to Dr.

Grimes due to a lump in her thigh, which she described as a "marble blueish, marble-sized-bouncy lump." (Tr. 198.) She testified that prior to the surgery, she was only aware of one, marble-sized lump, and after the surgery, a second lump developed in the groin area that was sore and "hard" to the touch. Geletka also testified that after the surgery performed by Dr. Grimes, she felt severe pain in her hip and continued numbness. "[T]wo weeks post-op," she finally "got brave enough to * * * touch and look real good [at the area where the surgery was performed]" and she found that the "bouncy marble" still persisted. (Tr. 222.) She testified that this "marble" still persisted at the time of trial. When Geletka noted her concerns about the still-present "marble" to Dr. Grimes, he sent her to another facility for an ultrasound, which revealed that the "marble" was a saphena varix.

{¶ 13} Geletka testified that at this point, she began investigating this matter on her own. She did not believe that she had a hernia at all. She felt that she was able to understand her medical records due to her history working at MetroHealth and requested them. After doing her own research and reviewing her medical records, Geletka noticed that the operative note did not indicate that there was a "sac," which is characteristic of hernias. Armed with this knowledge, she confronted Dr. Grimes at her final appointment, who, by Geletka's testimony, admitted that she did not have a hernia at all and that the mesh insertion was unnecessary. Geletka then asked Dr. Grimes why he placed the mesh if there was no hernia, and he allegedly informed Geletka that "[w]e already cut you. And you know, there was this

little opening in the femoral canal" and that insertion would prevent a future hernia. (Tr. 238.)

{¶ 14} Regarding her injuries, Geletka testified that this surgery has affected her because she has suffered from chronic pain ever since the surgery. She states that she experiences pain from the hip to the thigh and that the hard lump that appeared in her groin after the surgery bothers her "quite often." She also complains of pain in her legs, which she attributes to the existence of her varicose veins and the saphena varix, both of which predated the hernia operation, but were painful items that she thought would resolve as a result of the surgery. Finally, she noted that she feels that she missed out on spending time with her husband before he succumbed to an illness and passed away, and that she can no longer take her pets for daily walks in the park.

{¶ 15} On cross-examination, Dr. Grimes's counsel confronted Geletka about her deposition testimony, including the fact that she admitted that Dr. Grimes did not say that there was no hernia, but said that it was tough for them to find, which is why he cut her further. Geletka was also questioned about her medical history, including a significant medical history of varicose veins that cause her pain and require her to constantly wear compression socks. She also has a history of endometriosis, pelvic pain, and fibromyalgia. Prior to presenting to Dr. Grimes, Geletka admitted that she had longstanding, debilitating pain and sought the services of a pain management physician. She also saw a vascular surgeon for pain in her lower left extremities, described as aching, burning, itching, and throbbing.

The "marble" was examined by two doctors, and one, Dr. Rocco Ciocca, recommended that Geletka go to a general surgeon because he suspected it could have been a hernia. It was at this point that she was referred to Dr. Grimes, who performed a thorough initial examination. On cross-examination, Geletka was shown a medical record from one of her follow-up visits with Dr. Grimes where she indicated that her post-operative pain was minimal. She countered the contents of the record by stating that the operation continues to cause her terrible hip pain, which only began after the surgery. She did, however, admit that her hip pain was later diagnosed as trochanteric bursitis and piriformis tendon syndrome. Geletka was also questioned about her left ovary removal in September 2019, which resolved some of her left-sided pain.

{¶ 16} On redirect examination, Geletka suggested that she was able to distinguish all of her existing problems and pain from the pain specifically caused by the hernia surgery.

{¶ 17} Geletka's next witness, Jill Page ("Page"), attended several medical appointments with Geletka. Page testified that Geletka's final appointment with Dr. Grimes had many different purposes: Geletka's concerns about the length of the surgery; Geletka's concerns that her pre-surgery concerns were not addressed by the surgery; that Geletka was still symptomatic post-surgery; Geletka's concerns about the mesh, a foreign body, being placed inside of her; that Dr. Grimes did not find a sac when he operated on Geletka and; whether there was a hernia in the first place. Page testified that Dr. Grimes admitted that there was no hernia, and when

questioned as to why he inserted the mesh, he told Geletka that it was to prevent a future hernia.

{¶ 18} Dr. Grimes was Geletka's final witness. Dr. Grimes testified in significant detail about his history and qualifications. Dr. Grimes reiterated his testimony from his deposition: his definition of a femoral hernia is "a defect that is abnormal that allows normal tissue to pass from one cavity to the other." (Tr. 331.) In other words, Dr. Grimes does not believe that a hernia always has a sac. He maintains that he originally diagnosed Geletka with a femoral hernia and that remains the diagnosis to this day. Dr. Grimes maintained that the "blue marble" was a separate and distinct medical problem and he recommended that Geletka present to vascular surgeons for treatment. He also testified that days prior to the hernia operation, Geletka presented to the emergency room complaining of pain in the area of the hernia, and the emergency room took a CT scan. Dr. Grimes discussed the results of the CT scan and noted that the CT scan did not reveal a hernia. Dr. Grimes explained, however, that this does not mean that the hernia did not exist. He explained that Geletka was likely laying down for the CT scan, and Geletka's presentation at his own examination indicated that the hernia "comes out when she stands up [and] goes back in when she lays down." (Tr. 399.) When pressed about Geletka's post-surgery concerns, Dr. Grimes testified that he ordered the ultrasound because Geletka was concerned about a lump that was farther down from the site where he operated. Dr. Grimes testified that he ordered the ultrasound after the procedure to confirm that the "marble" was vascular in nature so that he

could send her to a vascular surgeon. Regarding the existence of the hernia, he testified that during the surgery, he found "an abnormally large femoral defect" and that he placed mesh in the area. (Tr. 437.) He also confirmed that the hernia mesh was inserted abutting a lymph node and that inflammation is involved in the healing process, usually in the first four to six weeks after an operation. He confirmed that the ultrasound revealed that her lymph nodes were enlarged and that the enlarged node was abutting the mesh, but that this was still within the normal healing window.

{¶ 19} After Geletka rested, the parties again addressed the medical records that would be admitted as exhibits. Geletka's counsel indicated that he would provide medical records as two separate exhibits and that he would work out the stipulation with Dr. Grimes's counsel. The court clarified:

> THE COURT: Okay. Now, so I understand that we don't have Plaintiff's Exhibit 1 and 2 before us exactly right now, but it is reasonably believed we're going to be able to reach a stipulation to Plaintiff's Exhibit 1 and 2 as being authentic, right [Dr. Grimes's counsel]?
>
> [DR. GRIMES'S COUNSEL]: Yes. * * *

(Tr. 508-509.)

{¶ 20} At this point, Dr. Grimes's counsel moved for a directed verdict, noting that Geletka failed to meet her evidentiary burden. Geletka's counsel responded, and the court adjourned for the day, noting that the court was going to review the evidence offered so far and make a ruling the following day. The next day, the trial court again allowed counsel for Geletka and Dr. Grimes to bring

anything pertinent to its attention before ruling on the directed verdict. The court discussed its review of the testimony and informed the parties that it was going to grant the directed verdict in favor of Dr. Grimes. The trial court later journalized this denial, which stated:

> After argument and careful consideration, the court grants the motion and directs a verdict against plaintiff and in favor of defendants upon her claims against defendants. Plaintiff's prima facie case did not include any evidence — specifically, any expert testimony — that causally connected defendant doctor's deviation from the appropriate standard of care (use of mesh plug) to any pain and suffering or other injury to plaintiff. Judgment in favor of defendants and against plaintiff is entered upon plaintiff's complaint. Costs to plaintiff. This is a final judgment under R.C. 2505.02.

{¶ 21} After this order was journalized, Geletka timely filed a motion for new trial, which included a request for sanctions against Dr. Grimes's counsel based on counsel's refusal to stipulate to the medical records. In this motion, Geletka's counsel noted that he had planned to use medical records from providers at the Cleveland Clinic that indicated that Geletka's pain was caused by the insertion of the mesh, but Dr. Grimes's counsel "obstructed" his ability to show these by refusing to stipulate to the authenticity of the records. Dr. Grimes's counsel filed a brief in opposition and the trial court denied the motion for a new trial and declined to impose sanctions. The trial court's denial noted that Geletka herself did not refer to or introduce these Cleveland Clinic records at trial, and the evidence received at trial forms the basis for directing a verdict. Regarding the request for sanctions, the court noted that

[p]laintiff's motion seeks to sanction defense counsel for a failure to honor an imagined pretrial stipulation about the authenticity of Plaintiff's medical records. At no point in trial — on the record or off — did Plaintiff's counsel claim there was a pretrial stipulation as to the records. The Court hears of this contention from Plaintiff for the first time in the motion for new trial.

At the outset of trial when Plaintiff's counsel attempted to display a medical record to the jury, Defendants objected and a long sidebar conference was held. Defense counsel complained that they had no idea what document Plaintiff's counsel was showing to the jury since he had failed to provide them a copy of Plaintiff's exhibits during pretrial discovery despite their discovery requests. Plaintiff's counsel immediately countered that he was not going to introduce the medical records in evidence. The Court reminded him that the medical records would have to be in evidence in order to support the expert's opinion as to Plaintiff's medical care. Then Plaintiff's counsel suggested the parties use Defendants' Bate[s]-stamped copy of the medical records but defense counsel refused to provide Plaintiff with exhibits which Plaintiff had the burden to produce.

The court noted during the sidebar that Plaintiff could bring in a medical records custodian or pursue a stipulation on authenticity but that in any event Plaintiff had to show defense counsel the medical records exhibits before displaying them to the jury so that they could assure themselves the exhibits were correct and authentic. Plaintiff's counsel then offered to put the exhibits on the overhead screen and flip through them so defense counsel could visually assure they were authentic. The Court rejected that maneuver as taking up valuable trial time but suggested the parties do this on their own time after completion of trial for the day.

The inaction on medical records continued with the result that no Plaintiff's medical record exhibit was marked, identified or used with any of Plaintiff's witnesses. Defense counsel used their copies of Plaintiff's medical records as exhibits during testimony and understandably Plaintiff did not object.

Plaintiff's motion for new trial does not establish any ground under Civ.R. 59 for such relief. As to the motion for sanctions, this Court has no jurisdiction to sanction defense counsel for alleged professional misconduct but this is a moot point; Plaintiff bases this claim upon an

alleged stipulation about the authenticity and admissibility of Plaintiff's medical records that was never voiced during trial.

{¶ 22} It is from this denial that Geletka now appeals, assigning two errors for our review.

> I. The Trial Court abused its discretion and committed prejudicial error in not granting Plaintiff's Motion for New Trial under Civ.R. 59(A)(1) and (2).

> II. The Trial Court abused its discretion and committed prejudicial error in granting Defendants' Motion for Directed Verdict.

## II. Law and Analysis

{¶ 23} We first address Geletka's second assignment of error because the motion for a directed verdict occurred prior to the motion for a new trial.

{¶ 24} After Geletka presented her case, Dr. Grimes's counsel moved for a directed verdict:

> [DR. GRIMES'S COUNSEL]: * * * First, defendants would move for a directed verdict on the entire case based upon plaintiff's expert testimony saying that the only pain that would be caused by the alleged negligence, i.e., putting in of the mesh when it was not necessary, was any pain at the site of the mesh.

> Plaintiff's testimony, when she testified, she did not testify as to having any pain at the site of where the mesh was inserted or above that site.

> Also, plaintiff's expert testified that based upon the medical records he could not say to a reasonable degree of medical probability that she suffered any pain related to the mesh.

(Tr. 512.)

{¶ 25} After hearing from both parties, the trial court adjourned for the evening. The next day, the trial court granted Dr. Grimes's motion for a directed verdict. In granting the motion, the trial court explained:

THE COURT: Now, if that is going to be evidence that the mesh caused the plaintiff harm, Dr. Liberman would have had to say so, and he did not. He said the opposite. That he saw nothing in the medical record to indicate harm to the plaintiff from the mesh.

Now, this is not a pleasant thing for the Court to grant a motion for directed verdict at the end of the plaintiff's case, but I have a legal obligation to both sides of this case to examine it.

I spent 45 minutes yesterday. I took extensive notes of all the testimony. I read Dr. Liberman's testimony last night. I went back to it this morning.

I read the cases cited to me by the defendants. They were helpful, not super helpful but — I've also examined the plaintiff's testimony. And as you know, under Ohio law, plaintiff is incompetent to provide the causal link between the mesh and her pain.

So I am granting the motion for the directed verdict. * * *

(Tr. 580-581.)

{¶ 26} Motions for a directed verdict are governed by Civ.R. 50. "A motion for a directed verdict tests the legal sufficiency of the evidence to take the case to the jury[.]" *Harris v. Ali*, 8th Dist. Cuyahoga No. 73432, 1999 Ohio App. LEXIS 2433, 11 (May 27, 1999), citing *Wagner v. Midwestern Indemn. Co.*, 83 Ohio St.3d 287, 294, 699 N.E.2d 507 (1998). A motion for a directed verdict "is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds that reasonable minds could come to only one conclusion and that conclusion is adverse to such party." *Wawrzyniak v. Zayat*, 8th Dist. Cuyahoga No. 76487, 2000 Ohio App. LEXIS 3759, 5 (Aug. 17, 2000), citing Civ.R. 50(A)(4); *Crawford v. Halkovics*, 1 Ohio St.3d 184, 186, 438 N.E.2d 890 (1982); *Ltd. Stores v. Pan Am.*, 65 Ohio St.3d 66, 73, 600 N.E.2d 1027 (1992). A trial court may not

weigh the evidence nor test the credibility of the witnesses but must give the party opposing the motion the benefit of all reasonable inferences from the evidence. *Baeppler v. McMahan*, 8th Dist. Cuyahoga Nos. 74938, 75131 and 76042, 2000 Ohio App. LEXIS 1653, 11 (Apr. 13, 2000), citing *Zavasnik v. Lyons Transp. Lines*, 115 Ohio App.3d 374, 378, 685 N.E.2d 567 (8th Dist.1996). Since a directed verdict is a question of law, our review is de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4.

{¶ 27} To prevail on a medical-malpractice claim, a plaintiff must establish, by a preponderance of the evidence, (1) the applicable standard of care; (2) a negligent failure by the defendant to render treatment in conformity with the standard of care; and (3) that the resulting injury was proximately caused by the defendant's negligence. *Brush v. Eisengart*, 8th Dist. Cuyahoga No. 72999, 1999 Ohio App. LEXIS 3728, 4 (Aug. 12, 1999), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131-132, 346 N.E.2d 673 (1976); *Ulmer v. Ackerman*, 87 Ohio App.3d 137, 140, 621 N.E.2d 1315 (3d Dist.1993); *Avondet v. Blankstein*, 118 Ohio App.3d 357, 692 N.E.2d 1063 (8th Dist.1997). The directed verdict in the instant matter implicates prong (3), that Dr. Grimes's alleged negligence caused injury to Geletka. The causal connection required by prong (3) must be established by expert testimony. *Martin v. Kelly*, 8th Dist. Cuyahoga No. 44749, 1982 Ohio App. LEXIS 11319, 4 (Dec. 9, 1982), citing *Darnell v. Eastman*, 23 Ohio St.2d 13, 17, 261 N.E.2d 114 (1970). The expert testimony establishing causation must be expressed in terms of probability, which is defined as "a greater than fifty percent likelihood that it produced the

occurrence at issue." *Stinson v. England*, 69 Ohio St.3d 451, 451, 633 N.E.2d 532 (1994), syllabus, citing *Shepherd v. Midland Mut. Life Ins. Co.*, 152 Ohio St. 6, 87 N.E.2d 156 (1949), syllabus; *Cooper v. Sisters of Charity, Inc.*, 27 Ohio St.2d 242, 252, 272 N.E.2d 97 (1971). Moreover, an expert's testimony "need not include the magic words 'probability' or 'certainty' but, when reviewed in its entirety, the testimony 'must be equivalent to an expression of probability.'" *Smith v. Dillard's Dept. Stores*, 8th Dist. Cuyahoga No. 75787, 2000 Ohio App. LEXIS 5820, 33 (Dec. 14, 2000), quoting *Schroeder v. Parker*, 8th Dist. Cuyahoga No. 73907, 1998 Ohio App. LEXIS 5919, 5 (Dec. 10, 1998). The expression of probability relates to the competence of the evidence and not the weight of the evidence. *Smith* at *id.*, citing *Stinson* at 455.

{¶ 28} Since Geletka was not qualified as an expert and her claim requires expert testimony to establish a prima facie claim, we are unable to consider Geletka's testimony in reviewing the evidence that informs a directed verdict. Since Dr. Liberman was Geletka's sole expert during the trial, we look to his testimony to determine whether Geletka established sufficient evidence to overcome a directed verdict. On appeal, Geletka directs us to the following testimony from Dr. Liberman that occurred during his direct examination:

> [GELETKA'S COUNSEL]: Okay. What injuries from this surgery — and if you don't have a complete list, I'll give you time to think about it. What injuries from Dr. Grimes' negligence is it your opinion with a reasonable degree of medical certainty Mrs. Geletka sustained?
>
> * * *

[DR. LIBERMAN]: So his negligence — the injury that was caused to Mrs. Geletka from his negligence would be anything related to the mesh placement. So pain at the site of the mesh in that area would be due to the negligence.

[GELETKA'S COUNSEL]: Okay. Would pain from the operation itself, the incision itself, be part of her injuries?

* * *

[DR. LIBERMAN]: No, I don't believe so.

[GELETKA'S COUNSEL]: Why not?

[DR. LIBERMAN]: Because I do not feel he was negligent taking her to the operating room. The negligent part was putting in the mesh.

(Tr. 123-125.) Geletka argues that this line of testimony proves that Dr. Liberman planned to testify "that Dr. Grimes was negligent in putting mesh into Mrs. Geletka's normal femoral ring and that the negligence of putting in the mesh that caused post-operative pain at the site of the mesh was the direct and proximate cause of Mrs. Geletka's post-operative pain and suffering[.]" Geletka notes, however, that because she was "obstructed" from utilizing any medical records on direct examination, Dr. Liberman avoided discussing them. The issues surrounding the medical records will be discussed at length in the next assignment of error.

{¶ 29} Despite Geletka's contention that this line of questioning proves what Dr. Liberman was prepared to testify or wanted to testify, Geletka cannot avoid that what is in the record before us is the evidence that must be received and considered in determining whether a directed verdict was warranted. We note that in the above testimony and for the remainder of his direct examination, Dr. Liberman only spoke

in generalities and did not offer an opinion about Geletka's specific injuries based on a reasonable degree of medical probability; he noted that any pain stemming from the mesh in the area of insertion would be directly related to Dr. Grimes's negligence but failed to identify any specific injuries.

{¶ 30} Turning to Dr. Liberman's cross-examination, Dr. Grimes's defense focused on demonstrating that Geletka actually had a hernia that required mesh, a medical complaint that was separate and distinct from the saphena varix. In order to do this, Dr. Grimes's counsel provided some of Geletka's medical records to Dr. Liberman; specifically, the medical record from Dr. Como from January 2020. Under Evid.R. 703, experts may testify in terms of an opinion based on facts perceived by the expert or admitted into evidence at trial. *See also State v. Jones*, 9 Ohio St.3d 123, 124, 459 N.E.2d 526 (1984). Since the defense's medical records were properly admitted into evidence, Dr. Liberman was able to offer his testimony based on the records that the defense provided. This line of questioning also fleshed out Dr. Liberman's opinion regarding any pain caused by the mesh:

> [DR. GRIMES'S COUNSEL]: Doctor, based upon your review of the clinical records that you have seen up until today, you can't say that the mesh plug has caused her any pain; correct? You can't say that to a medical probability; correct?
>
> [DR. LIBERMAN]: I believe that she said that in her deposition, but I have not seen that in any of the medical records.
>
> [DR. GRIMES'S COUNSEL]: Okay. So let me ask you the question again: Based upon the clinical records you have seen until today, you can't say that the mesh plug to a reasonable degree of medical probability has caused her any pain; correct?

[DR. LIBERMAN]: Not from the medical records.

[DR. GRIMES'S COUNSEL]: So my statement is correct; true?

[DR. LIBERMAN]: True.

[DR. GRIMES'S COUNSEL]: And when I say the mesh has not caused her any pain, you have not seen anything in the medical record you've reviewed that you're basing your testimony on that you relate to the mesh plug; correct?

[DR. LIBERMAN]: Not from the medical record, correct.

(Tr. 145-147.)

{¶ 31} During cross-examination, Dr. Liberman also admitted that the lymph node complaints that Geletka had in January 2020, which indicate that pain and discomfort in the groin area dates back to June 2019, could not have been related to the hernia.

{¶ 32} On redirect examination, Geletka's counsel referenced the January 2020 medical record that the defense showed Dr. Liberman. After being shown this record, Dr. Liberman opined that "[l]ymph nodes develop often where there's inflammation"; that inflammation "can" cause pain; that the lymph nodes abutting the mesh were enlarged; and that the clinical significance of a lymph node next to the mesh "is that the body's reacting to the mesh" because it is a foreign body and causing inflammation due to the fact that the mesh is "not normally there." (Tr. 180-182.)

{¶ 33} Remarkably absent from this testimony is Dr. Liberman's opinion, based on a reasonable degree of medical probability, that Geletka's complaints of

pain, including those complaints in the groin, the hip, in the site of the mesh, and other places, were caused by her body's reaction to the mesh. Dr. Liberman's testimony, especially when examined with his opinion on cross-examination that the medical records do not indicate that Geletka is experiencing any pain associated with the mesh insertion, did not connect Geletka's pain and complaints to the insertion of the mesh. Dr. Liberman's testimony that Geletka's body was "reacting" to the mesh does not necessarily indicate that Geletka is experiencing pain, injury, and suffering as a direct result of the mesh insertion, and Dr. Liberman did not testify as much. The generalities that Dr. Liberman spoke in were insufficient to demonstrate that the "reaction" that Geletka's body was having to the mesh was causing inflammation, which was in turn causing her pain complaints. This causal connection is especially critical in a case such as this one where the pain complaints occur months after the allegedly negligent surgery and because Geletka is a patient with chronic pain and many other conditions in the area where the hernia mesh was inserted, including hip, ovarian, and vascular issues. "Complaints of persistent pain subsequent to medical care are insufficient to establish an inference of medical malpractice to circumvent the necessity of evidence from an expert." *Lyons v. Brandly*, N.D.Ohio No. 4:03 CV 1620, 2009 U.S. Dist. LEXIS 131559, 10 (Mar. 10, 2009), citing *Buerger v. Ohio Dept. of Rehab. & Corr.*, 64 Ohio App.3d 394, 399, 581 N.E.2d 1114 (10th Dist.1989). Dr. Liberman was required to opine, based on a reasonable degree of medical probability, that Geletka's complaints of pain and suffering were caused by the mesh insertion.

{¶ 34} In *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, the Ohio Supreme Court addressed a medical claim dealing with informed consent where the trial court granted a directed verdict. *White*, however, also dealt with a causation issue, and the court ultimately suggested that an expert's opinion that a surgery was the "most likely cause" of the plaintiff's chronic pain did not rise to the level of "a reasonable degree of medical certainty that the surgery more likely than not caused the nerve damage[.]" *Id*. at ¶ 44. We find that a comparable situation exists in the instant matter. Dr. Liberman's testimony suggests that the hernia mesh abutting the lymph node could cause the lymph nodes to enlarge that is consistent with inflammation and the body reacting to the mesh, but fails to opine with certainty that this situation is what is causing Geletka's pain, especially after indicating during cross-examination that the medical records are totally void of any indication that the hernia mesh is causing Geletka any pain.

{¶ 35} We have thoroughly reviewed the record before us, paying special attention to Dr. Liberman's testimony on redirect examination that Geletka specifically directed us to in her brief. We are unable to conclude that Dr. Liberman's testimony, when examined as a whole, established that insertion of the mesh was causally related to Geletka's complaints of pain. The trial court properly granted a directed verdict for the defense. We therefore overrule Geletka's second assignment of error.

{¶ 36} In Geletka's first assignment of error, Geletka argues that the trial court erred in denying her motion for a new trial made pursuant to Civ.R. 59(A)(1) and (2).

{¶ 37} Civ.R. 59(A)(1) and (2) pertinently provide that

[a] new trial may be granted to all or any of the parties * * * upon any of the following grounds:

(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevent from having a fair trial;

(2) Misconduct of the * * * prevailing party[.]

{¶ 38} The standard of review applied to a trial court's ruling on a motion for a new trial depends on the grounds for the motion. *Robinson v. Turoczy Bonding Co.*, 8th Dist. Cuyahoga No. 103787, 2016-Ohio-7397, ¶ 23. Motions for new trial premised on Civ.R. 59(A)(1) and (2) are both reviewed for an abuse of discretion. *Robinson* at *id.*; *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, ¶ 13. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse ""implies that the court's attitude is unreasonable, arbitrary or unconscionable."" *State v. Montgomery*, 169 Ohio St.3d 84, 2022-Ohio-2211, ____ N.E.3d ____, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 39} Geletka's motion for a new trial alleged that Dr. Grimes's counsel created an irregularity in the proceeding and engaged in misconduct in refusing to stipulate to the authenticity of the medical records, thus preventing Geletka from using them during the trial. Geletka claims that the trial court abused its discretion in (1) ignoring the evidence in both Geletka's and Dr. Grimes's trial briefs; and (2) failing to recognize that both parties were utilizing a complete set of Bates stamped medical records that both parties shared. We find, however, that the record does not support Geletka's arguments.

{¶ 40} To be admissible, hospital records must be authenticated. Evid.R. 901(A). A party may prove the authenticity of records in two ways: (1) authenticity may be stipulated to by the parties or (2) Evid.R. 901(B)(10) allows for authentication of medical records by "'[a]ny method of authentication or identification provided by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio or by other rules prescribed by the Supreme Court.'" *State v. Youssef*, 8th Dist. Cuyahoga No. 101362, 2015-Ohio-766, ¶ 30, quoting Evid.R. 901(B)(10). Relevant to the instant matter is R.C. 2317.422, Ohio's statute governing the authentication of medical records.

{¶ 41} R.C. 2317.422 instructs that medical records may be authenticated by "call[ing] the custodian, person who made such records, or person under whose supervision they were made, as a witness" or by any such person's endorsing on the records "the person's verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual

course of business of the institution." R.C. 2317.422(A). This method of authentication is only available, however, if "the party intending to offer them delivers a copy of them, or of their relevant portions, to the attorney of record for each adverse party not less than five days before trial." *Id*. Without either a stipulation or proper authentication, medical records may not be admitted into evidence. *See Bzdafka v. Bretz*, 8th Dist. Cuyahoga No. 95840, 2011-Ohio-3982, ¶ 17.

{¶ 42} First, contrary to Geletka's contention that the authenticity was stipulated to in the trial briefs, we note that both parties' trial briefs indicate that they "anticipate" that the parties will stipulate to the authenticity of the medical records.[1] However, at trial, Dr. Grimes's counsel made clear in a sidebar, before any witness was sworn in, that they could not reasonably stipulate to the authenticity of any medical records that Geletka planned to use because an exhibit list and copies of the records had not been provided to them. At this point, the court informed Geletka's counsel that if he intended to introduce medical records as exhibits, he would need to obtain a stipulation from defense counsel as to the records that he intended to use, or bring in a records custodian who could testify regarding the authenticity of the records. These options were made clear to Geletka's counsel, and

---

[1] Dr. Grimes's trial brief states, "It is anticipated that the parties will stipulate to the authenticity of the hospital and medical records of Deborah Geletka."

Geletka's trial brief states, "It is anticipated that parties can stipulate on the authenticity of the medical records."

a thorough review of the trial transcript indicates that neither of these options were undertaken.

{¶ 43} Second, Geletka's contention that there was an agreement that both parties would use the singular shared file of documents is not supported by any evidence in the record. Geletka attached an email that her counsel received from Dr. Grimes's counsel, prior to trial, indicating that the medical records attached to the email were the medical records that Dr. Grimes's counsel planned to use at trial. Above that email is correspondence from Dr. Grimes's counsel asking Geletka's counsel to send his trial exhibits; a response to this email is not contained in the record before us. The record does not indicate that Dr. Grimes's counsel and Geletka's counsel agreed to use the same set of records nor does it appear that Geletka's counsel asked Dr. Grimes's counsel if he could utilize the records that they provided him with in advance of trial. Geletka's counsel also did not file an exhibit list at any point prior to or during trial.

{¶ 44} When reviewing claims that counsel acted improperly, we consider the claim in the context of the whole trial. *Masterson v. Brody*, 8th Dist. Cuyahoga No. 111043, 2022-Ohio-3429, ¶ 46, citing *Secrest v. Gibbs*, 11th Dist. Lake No. 2003-L-083, 2005-Ohio-2074, ¶ 77, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Throughout trial, Dr. Grimes's counsel signified their willingness to stipulate to the authenticity of medical records provided that they were given an opportunity to compare the offered records with their own set of records:

THE COURT:  Okay.  And so, hopefully, you folks will have a moment to compare Defense Exhibits — the defense copies with plaintiff's copies, and then down the road you might be able to stipulate that they are, in fact, authentic and you can withdraw the objection, correct?

[DR. GRIMES'S COUNSEL]:  Absolutely.  That's all I've been asking for.

(Tr. 71.)

THE COURT:  Okay.  Do we both understand what records the other one wants to offer?

[GELETKA'S COUNSEL]:  Right.

[DR. GRIMES'S COUNSEL]:  Yes, I understand.  They're not acceptable because of the form.  I think we can work and make them acceptable.

* * *

[DR. GRIMES'S COUNSEL]:  I think if we can work together, take out certain pages and to [sic] make them proper exhibits that we can stipulate to authenticity and admissibility in the case; but as they are right now, we can't do that.

(Tr. 505.)

{¶ 45} From the record before us, it is evident that Dr. Grimes's counsel was not purposefully or maliciously withholding a stipulation; Dr. Grimes's counsel was clearly willing to stipulate to the authenticity of the medical records, and indeed stipulated to the authenticity of some of them by the close of trial.  Dr. Grimes's counsel was simply concerned with ensuring that the records they were stipulating to were the same as the records in their possession, which is well within their right to do.  We cannot conclude that Dr. Grimes's counsel engaged in misconduct or created an irregularity in the proceeding in refusing to stipulate to records that they

had not seen. We further note that Dr. Grimes's counsel was not obligated to stipulate to the authenticity of records and that other avenues of authentication were available to Geletka's counsel that he could have undertaken to ensure that the medical records that he intended to use at trial were admissible. Furthermore, these options were made abundantly clear to him before the first witness was even sworn in.

{¶ 46} Geletka directs us to *Edge v. Fairview Hosp.*, 8th Dist. Cuyahoga No. 95215, 2011-Ohio-2148. In *Edge*, the injured plaintiff repeatedly attempted to get a sentence from a medical record into evidence that had already been excluded by a pretrial motion in limine. In reviewing the case, this court noted that "defendants-appellees stipulated to the authenticity of any of the medical records/therapy records obtained in the course of discovery" within its trial brief and ultimately concluded that without any reservation to the contrary, the defendants waived their right to object to the medical records on hearsay grounds in stipulating to the authenticity of the documents in full. *Id.* at ¶ 16. *Edge* is entirely distinguishable from the instant matter because we are unable to conclude from the record before us that Dr. Grimes's counsel stipulated to the authenticity of any of the medical records before trial commenced. We also note that Dr. Grimes's trial brief specifically reserved the right to object to any medical records "on any other basis allowed under Ohio law."

{¶ 47} Based on the record before us, we are unable to conclude that the trial court erred in denying Geletka's motion for a new trial. The trial court did not abuse

its discretion in determining that the grounds for a new trial that Geletka specified were largely within Geletka's control to prevent. We therefore overrule Geletka's first assignment of error.

### III. Conclusion

{¶ 48} Based on our review of the applicable law and facts, we are unable to find merit to any of Geletka's assignments of error. The trial court did not err in granting a directed verdict in favor of Dr. Grimes and further did not err in denying Geletka's motion for a new trial.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MICHAEL JOHN RYAN, J., CONCUR