[Cite as *Waetcher v. Laser Spine Inst., L.L.C.*, 2023-Ohio-3715.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

SHELLI L. WAECHTER,                    :

    Plaintiff-Appellant,            :

                                      No. 112022

    v.                              :

LASER SPINE INSTITUTE, LLC, ET AL.:

    Defendants-Appellees.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 12, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-932007

---

### *Appearances:*

Thomas J. Misny, M.D., Inc., and Thomas J. Misny, *for appellant*.

Bonezzi Switzer Polito & Hupp Co. L.P.A., Bret C. Perry, Ronald A. Margolis, and Jason A. Paskan,*for appellees*.

MARY J. BOYLE, J.:

{¶ 1} Plaintiff-appellant, Shelli Waechter ("Waechter"), appeals the trial court's denial of her motion for a new trial. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} This appeal stems from a refiled medical malpractice lawsuit brought by Waechter that culminated in a jury verdict for the defense. In her refiled complaint, Waechter asserted a medical negligence claim that ultimately proceeded to a jury trial against Harold Meyer ("CRNA Meyer"), a certified registered nurse anesthetist.

{¶ 3} In her refiled complaint, Waechter, who resides in Wisconsin, claimed that she had pain on the right side of her neck that radiated to the right side of her face and right shoulder. Waechter alleged that in December 2017, Brad M. Picha, M.D. ("Dr. Picha"), an orthopedic surgeon for Laser Spine Institute, LLC ("LSI"), evaluated her, and performed a laminotomy with foraminotomy and decompression of the nerve root at C4-C5 on her right side.[1] Waechter contended that during the procedure, general laryngeal mask anesthesia was provided by Andre Dobson, M.D. ("Dr. Dobson"), an anesthesiologist at LSI, and CRNA Meyer while she was in the prone position. Waechter alleged that she reported numbness in her left arm and left leg 15 minutes after the procedure followed by numbness and severe weakness in her left upper and lower extremities and tongue. Waechter further claimed that she was transferred by ambulance to Cleveland Clinic Hillcrest

---

[1] Dr. Picha was a named defendant in Waechter's original lawsuit wherein he filed a motion for summary judgment. The motion was granted, and he was dismissed with prejudice because "[n]either of [Waechter's] experts opined Dr. Picha breached the standard of care when he performed [Waechter's] surgery or that Dr. Picha proximately caused her injuries." *Waechter v. Laser Spine Inst., LLC*, Cuyahoga C.P. No. CV-18-908257 (Oct. 30, 2019).

Hospital ("Hillcrest"), where she was diagnosed with a spinal cord contusion and edema at the left hemicord and central cord at the C4-C5 level that "could be caused by hyperextension of her neck during the induction of anesthesia" as well left eye ptosis and miosis and left upper and lower extremity and tongue paresis and parathesias "from trauma to the spinal cord at C4-C5 level post cervical spine surgery." (Refiled Complaint, 04/21/20.) Waechter asserted that CRNA Meyer breached the standard of care when her cervical spine was hyperextended during the induction of anesthesia. Waechter claimed that as a direct and proximate cause of CRNA Meyer's negligence, she continued to suffer from weakness in her upper and lower extremity, was unable to perform her activities of daily living, and sustained damages in the form of pain and suffering, medical bills, and lost wages. (Refiled Complaint, 04/21/20.)

{¶ 4} As the lawsuit progressed, the parties engaged in discovery and motion practice. In June 2022, CRNA Meyer filed a motion for separation of witnesses, which was unopposed. In July 2022, motions were filed by both parties regarding Waechter's only anesthesiology and standard-of-care expert, Danielle Ludwin, M.D. ("Dr. Ludwin"). Despite CRNA Meyer's unopposed motion for the separation of witnesses, Waechter's counsel had provided Dr. Ludwin with the trial deposition testimony of another witness and Dr. Ludwin had reviewed it prior to her trial testimony being preserved via videotape. CRNA Meyer moved for Dr. Ludwin's exclusion pursuant to Evid.R. 615, which Waechter opposed. The trial court

subsequently granted CRNA Meyer's motion for the separation of witnesses and held both motions regarding Dr. Ludwin in abeyance.

{¶ 5} Days later, on July 19, 2022, the case was transferred to a visiting judge for trial due to a docket conflict and the unavailability of the original judge. Trial was called that same day and voir dire commenced. On July 20, 2022, a seven-day jury trial began concerning Waechter's claims against CRNA Meyer. The aspects of the trial relevant to this appeal are summarized below.

{¶ 6} Prior to opening statements on July 20, 2022, the trial court advised the jury that opening statements are not evidence; rather, they "outline what [each party] think[s] the evidence will be and what they expect the evidence will be * * *." (Tr. 198.) During Waechter's opening statement, Waechter's counsel explained that

> [o]n the morning of December 15, 2017 at [LSI] * * * CRNA Meyer walked [Waechter] into operating room number one at 9:15 in the morning for surgery.
>
> At 11:30 when Mrs. Waechter woke up in the post anesthesia unit, she was paralyzed on the left side of her body. Couldn't move her arm. Couldn't move her hands. Couldn't move her feet.

(Tr. 205.) Waecther asserted that the evidence would prove CRNA Meyer negligently hyperextended Waechter's neck when he was inserting an anesthesia breathing tube called a laryngeal mask airway device ("LMA device") while Waechter was in a prone position, resulting in a cervical spine contusion. Waechter's counsel explained:

> [O]ur allegation is that because this device is large and has got weight to it, and that there's nothing protecting Mrs. Waechter's neck from going backwards, that the allegation is that defendant CRNA Meyer

was negligent when he inserted this device, which was not FDA-approved for use in this position for posterior cervical spine surgery, and doing so he hyperextended Mrs. Waechter's neck and caused a cervical cord contusion right here in the neck.

(Tr. 231-232.)

{¶ 7} In CRNA Meyer's opening statements, defense counsel countered Waechter's statements and explained what he believed the evidence would demonstrate: Waechter's spinal cord contusion was not caused by a hyperextension of her neck and the hyperextension described by Waechter's counsel was "physically impossible." (Tr. 246.) Defense counsel also presented an alternate causation theory:

[W]hat happened is during the surgery on 12-15-17, Dr. Picha, not negligently because sadly it's a known and recognized risk of this procedure, with his surgical instruments entered into the left side, went through the layers that protect the spinal cord and injured the spinal cord.

And we have irrefutable proof of that. * * * Because this is a closed system you see.

And in order for the air to get in which is represented by the MRI, the air in the brain and in the spine, you have to have an opening in this area around the spine and the spinal cord that was contused. That's what happened here.

(Tr. 247-248.)

{¶ 8} During CRNA Meyer's opening statement, Waechter objected five times to comments pertaining to (1) the length of CRNA Meyer's counsel's career; (2) the amount of money one of Waechter's experts made for her testimony; (3) the future cross-examination of another one of Waechter's experts being "an interesting

thing to watch" and an advisement that the jury will "be able to formulate an opinion about [the expert's] believability, honesty, his credibility"; (4) Dr. Picha's alleged admission that Waechter's "dural injury was most likely caused by his surgery"; and (5) Waechter's counsel's "manipulat[ion of] experts and with[olding of] evidence." (Tr. 260, 261, 262-263, 264, 267.) Following a sidebar, the last objection was sustained. The trial court noted the escalating tension and emotional responses amongst the attorneys and said, "And I'm going to tell counsel to tone it down and not personally attack one another. * * * I want the facts to be examined, the law to be examined. I don't want to go into personal attacks on the attorney or to go into these side shows." (Tr. 271-272.) The trial court further noted:

> If somebody wants to file grievances at some bar association against somebody, that's their business, but I'm not the bar association's grievance committee here. We're trying this case here. Not any other allegations. And I'm not suggesting that these meet any standards for bar review, but I want to keep this focused on this case.

(Tr. 274.) Ultimately, the jury was instructed by the trial court to disregard defense counsel's comment about Waechter's counsel.

{¶ 9} Following opening statements, Waechter offered testimony about her treatment at LSI, Hillcrest, and BayCare Clinic Pain and Rehab Medicine ("BayCare"); the temporary paralysis she experienced following surgery at LSI in December 2017; her ongoing symptoms and limitations; her present physical condition; and her alleged damages for lost wages and medical expenses. Waechter then called CRNA Meyer to testify as a witness on cross-examination. CRNA Meyer testified that Waechter's neck was "never extended" during his insertion of the LMA

device; "[whatever caused her injury was not caused by the LMA [device]"; as an anesthesia nurse, he is "required to act under the supervision and direction of the anesthesiologist"; and after reading articles provided by LSI and going through LSI's training program that described the use of LMA device in the prone position for spinal surgeries, he believed that it was "a safe, effective, positive method of administering anesthesia to this patient at this time." (Tr. 417-418, 561, 587, 591.) CRNA Meyer explained:

> The LMA [device] did not cause her injury if her injury was caused by hyperextension because I never hyperextended her neck. It never happened. That's not the way these things are inserted. There's no force needed or involved. It is a simple two finger thing. You open the mouth, place it there, and it rotates easily into place. We would never use force. Certainly not force sufficient to bend someone's head way back. Well, one the device wouldn't even allow you to use such force. It bends. It's soft. And that would cause horrible trauma to the back of the throat. None of which we do. We just simply — it just doesn't work that way, sir.

(Tr. 603-604).

{¶ 10} Waechter's neurosurgery expert, James Lowe, M.D. ("Dr. Lowe"), testified about his expert practice, fees, income, and opinion that Waechter's spinal cord injury occurred in LSI's operating room but was not caused by Dr. Picha in his performance of Waechter's surgery. Rather, Dr. Lowe opined that Waechter's spinal cord injury was caused by hyperextension of Waechter's neck during the insertion of the LMA device while she was in the prone position. On cross-examination, Dr. Lowe further testified that he did not review intraoperative x-rays of Waechter's surgery.

{¶ 11} Waechter's anesthesiology and standard-of-care expert, Dr. Ludwin, also offered testimony. Dr. Ludwin testified after the trial court heard arguments regarding the defense's motion to exclude her testimony pursuant to Evid.R. 615 and denied CRNA Meyer's motion. Dr. Ludwin testified about her expert practice, fees, income, and opinion that the standard of care was not met in inserting the LMA in the prone position for cervical spine surgery. Dr. Ludwin believed that CRNA Meyer violated the standard of care by hyperextending Waechter's neck during the LMA's placement. On cross-examination Dr. Ludwin testified that she did not review and was not provided with Waechter's actual films.

{¶ 12} Waechter also called her orthopedic surgeon at LSI, Dr. Picha. Dr. Picha testified that he performed a laminotomy at C4-C5 on Waechter's right side and that he believed that the surgery went well and was without issues or complications. On cross-examination, Dr. Picha agreed that it was more probable than not that, given Waechter's surgery, air was let in by some opening in the dura, although he did not specifically attribute the injury to the surgery he performed. Dr. Picha did not know what caused Waechter's injury:

> [CRNA MEYER'S COUNSEL:] And Doctor, to be totally honest and candid with this jury, given the testimony that you have provided this afternoon during my opportunity to question you, when you stated that you do not know the cause of the contusion, per the MRI findings, you do not know what caused Waechter's neuro deficits; you really don't know if it was something that you did and just were unaware of during the surgical procedure, because you don't know one way or the other; isn't that true?
>
> [DR. PICHA:] Yes.

(Dr. Picha Trial Dep. 07/07/22, tr. 62.) Dr. Picha further testified that he was not given any of the images or films taken of Waechter prior to cross-examination.

{¶ 13} Over the weekend and in the midst of trial, Waechter filed a motion to disqualify the defense's expert, Parag G. Patil, M.D. ("Dr. Patil"), a neurosurgeon, claiming that he was not qualified to testify. The trial resumed after the weekend on Monday, the fifth day of trial. Waechter called her last witness, rested her case, and submitted the following exhibits: receipts for damages, Waechter's LSI anesthesia consent form, and the curricula vitae of Dr. Ludwin and Dr. Lowe. The defense moved for a partial directed verdict. After hearing arguments, the trial court denied the motion. The following day, CRNA Meyer called his only witness, Dr. Patil. Waechter's counsel did not bring to the court's attention the motion it filed electronically over the weekend before or during Dr. Patel's testimony.

{¶ 14} During his direct examination, Dr. Patil testified that he was a neurosurgeon and associate professor in anesthesiology, biomedical engineering, neurology, and neurosurgery. Waechter's counsel initially objected to Dr. Patil's testimony that he was engaged in the full-time medical clinical practice of neurosurgery, but subsequently withdrew the objection.

{¶ 15} Dr. Patil then opined about the proximate cause of Waechter's injury. Dr. Patil testified that the MRI scans taken after Waechter's LSI surgery revealed a spinal cord contusion that, in his opinion to a reasonable degree of medical certainty, was caused by "an inadvertent — an unintentional injury to the spinal cord most likely caused by an instrument during surgery." (Tr. 750-751.) Dr. Patil further

provided the following opinion regarding the presence of air seen in Waechter's CT scans of her neck and brain: "And so what I believe occurred is that during the surgery there was something that hit the spinal cord with sufficient force to cause a tear of the dura and also cause a tear of the arachnoid. This then allowed the outside air to enter." (Tr. 752.)

{¶ 16} Dr. Patil also explained how the contusion on Waechter's left C-4, C-5 could be caused by an operation on the right. Dr. Patil further opined that, for many reasons, it was "extremely unlikely" that Waechter's spinal cord injury was caused by hyperextension of the neck and that opinions indicating otherwise were "nonsense." (Tr. 756-757.)

{¶ 17} Ultimately, Dr. Patil opined to a reasonable degree of medical certainty that Waechter's spinal cord injury was caused by Dr. Picha and was an inadvertent intraoperative injury; Waechter's cervical spine was not hyperextended causing injury during placement of the LMA; CT scans confirmed that the free air present in both Waechter's brain and spine were caused by Dr. Picha's inadvertent intraoperative injury; Waechter's neurological injury was a known and recognized complication of the surgery performed; Waechter did not have an unstable spine; and the placement of the LMA did not cause Waechter's spinal injury. (Tr. 759-761.)

{¶ 18} During Dr. Patil's testimony, the defense briefly utilized a demonstrative exhibit: an illustration titled "Waechter's surgical injury contusion"

("Illustration").[2] After the Illustration was presented, one question was asked by the defense and answered by Dr. Patil before Waechter objected and a sidebar was held. During sidebar, arguments were made on the record regarding the Illustration. The sidebar concluded with the following exchange:

> THE COURT: But, I don't see the problem with them having the drawing. I fail to see it. But I look forward to your cross-examination. In fact, I would wonder if they withdrew this if you would pull it out again and so you could use it to your benefit.
>
> [WAECHTER'S COUNSEL]: Your Honor, I will withdraw my objection. If the Court would grant me permission to put this back up during my cross-examination.
>
> THE COURT: You don't have to ask permission. Of course, you can have the man retestify to something he's already testified to.
>
> [WAECHTER'S COUNSEL]: But I want the image back up.
>
> THE COURT: Of course, you can have the image back up.
>
> [WAECHTER'S COUNSEL]: Thank you, your Honor. Thank you.
>
> THE COURT: Objection withdrawn?
>
> [WAECHTER'S COUNSEL]: Objection withdrawn.

(Tr. 747-748.)

{¶ 19} During a lengthy cross-examination, Waechter's counsel initiated questioning about Dr. Patil's standard-of-care opinion and welcomed his testimony on the subject:

---

[2] The Illustration was not admitted into evidence and was not otherwise made a part of the record for this court's review. In her motion for a new trial, Waechter included a "recreation of Defense Co-Counsel's hand-drawn medical illustration" as an exhibit. (Motion, 08/10/22.)

[WAECHTER'S COUNSEL:] For the sake of time, — oh, heck let's put it on the record. Your first opinion would you read it please?

[DR. PATIL:] Do you want me to read?

[WAECHTER'S COUNSEL:] Your first opinion. Just the first one.

* * *

[DR. PATIL:] No action or inaction by Dr. Dobson or CRNA Meyer fell beneath the accepted standards of care nor did any negligent action by Dr. Dobson or CRNA — I guess I have should said CRNA Meyer proximately caused injury to [Waechter].

(Tr. 766.) Dr. Patil qualified his opinion as "surgical standard of care" "from a neurological perspective":

[WAECHTER'S COUNSEL:] Now, we're talking about the accepted standard of care for anesthesia, true?

[DR. PATIL:] I mean I could only provide the neurological perspective.

[WAECHTER'S COUNSEL:] I'm glad you put that on the record. But you offered an opinion on the standard of care for anesthesia in your first opinion, true? It's okay if you did. I'm just asking you that's an anesthesia standard of care that you are referring to not a neurosurgical standard of care.

[DR. PATIL:] I would say it's a surgical standard of care.

[WAECHTER'S COUNSEL:] Oh, you would?

[DR. PATIL:] Yes. I mean not general surgery. So if you do a bunch of operations you see it done in a number of ways and I thought it was within the standard of care for how those operations are done.

(Tr. 766-767.) During cross-examination, Waechter's counsel requested the Illustration be shown again to the jury and extensively questioned Dr. Patil about the demonstrative exhibit.

{¶ 20} After Dr. Patil's testimony was heard and he was dismissed, Waechter made an oral motion to disqualify Dr Patil "based on the fact that Dr. Patil * * * is not a board-certified anesthesiologist." (Tr. 896.) The trial court determined the motion was untimely after the following exchange:

THE COURT: Why are you making this motion so late after he testified?

[WAECHTER'S COUNSEL]: All right.

THE COURT: Wouldn't that be a pretrial motion [if] he's unqualified?

[WAECHTER'S COUNSEL]: Well, I did –

THE COURT: Have you ever heard of anybody granting a motion at the end of a trial after somebody testified?

[WAECHTER'S COUNSEL]: Your Honor, this weekend I submitted — I filed a motion with the Court.

THE COURT: I saw that. You didn't bring it up. I read it. I was totally unimpressed by it. I didn't bring it up and you didn't bring it up.

[WAECHTER'S COUNSEL]: Okay. But I'd just like to put it on the record.

THE COURT: All right. So that's untimely filed. You had plenty of notice about him and his background. You had his background CV.

(Tr. 895.)

{¶ 21} Following Dr. Patil's testimony, CRNA Meyer then rested his case and submitted the following exhibits: Dr. Patil's curriculum vitae and Waechter's medical records from LSI, Hillcrest, and BayCare.

{¶ 22} Both parties moved for a directed verdict. The trial court denied both motions without hearing arguments. Prior to closing arguments, the jury was

instructed that any statements made or questions asked by counsel during the course of trial that were not admissions or stipulations were not evidence. The jury was also instructed to disregard statements or answers ordered stricken and that such statements were not evidence and must be treated as if they were never heard.

{¶ 23} Closing arguments began on the seventh day of trial, and the court again reminded the jury that the parties' "[a]rguments are just that" and "the arguments are not evidence." (Tr. 946.) During Waechter's closing argument counsel again showed and discussed the Illustration.

{¶ 24} CRNA Meyer's closing argument began with comments regarding Waechter's burden of proof and compared the evidence submitted by both parties:

> What is evidence, folks? Medical records. [LSI]. Hillcrest record[s.] BayCare records. The expert testimony. The CT scans, the MRI scans. The CTA scans the intraoperative x-ray. The preoperative x-ray. The cervical block fluoroscopy. That is the evidence, folks.

> And this is the evidence [Waechter's counsel] is sending back to you to consider. One sheet from the [LSI], work records, and his expert CV. Not a single piece of medical evidence in a medical malpractice case. Ask yourself that.

> However, [CRNA] Meyers is giving you the evidence, BayCare records, Hillcrest records, LSI records, radiology reports.

> Why are you hiding the evidence? You have the burden of proof to prove a medical case and you don't provide medical evidence. This is all you are going to get from the plaintiff to make your decision. Work records and CVs.

(Tr. 978-979.)

{¶ 25} CRNA Meyer's counsel also discussed various aspects of trial that were "distractions" from the sole issue at hand: whether "Waechter has proven by a

preponderance of evidence that [CRNA Meyer] violated the accepted standard of care in his care and treatment plan by hyperextending her cervical spine during the placement of the LMA [device] on 12-15-17?" (Tr. 980-981.) In doing so, defense counsel asked, "Why did [Waechter's counsel] waste seven days?" (Tr. 981.) The defense then argued their theory of the case: that Dr. Picha's surgery caused Waechter's spinal cord injury, which is a recognized risk of the procedure. Defense counsel stated, "It happens in the best of hands. It happens. And when you can't find an expert to say that the dural injury was negligent, you got to figure out another way to get this case to the jury. And that's what's happening here. Manipulation. Manufacturing the case." (Tr. 989.) Defense counsel further mentioned that Dr. Picha was not provided with Waechter's Hillcrest images until he was cross-examined by the defense and claimed that evidence was withheld.

{¶ 26} Defense counsel discussed the credibility and veracity of Plaintiff's experts and commented, "Unfortunately some doctors opted to turn a courtroom into their own personal ATMs. They'll charge whatever they want and you pay for the testimony you get." (Tr. 995.) Defense counsel commented:

> So, folks, we spent seven days and I'm trying to think of an analogy as to why your time was wasted and I could only think about the Wizard of Oz movie. And if you remember when Toto is pulling at the curtain for the Wizard of Oz and Wizard is saying, Ignore the man behind the curtain. That's what this whole case was about. Ignore the man behind the curtain.
>
> * * *
>
> [Waechter's counsel] is the Wizard behind the curtain begging for Toto not to flip it back, folks, and you get an opportunity to do that today.

* * *

Ignore the medicine folks is what they want you to do.

* * *

Folks, send a message.  Not to Mrs. Waechter.  Send a message to folks like [Waechter's counsel] that we will not stand for this.  Litigation is fine when negligence occurs but not in this case folks.

(Tr. 1003-1006.)

{¶ 27} No objections were made by Waechter's counsel to any of the aforementioned arguments.  Throughout the other portions of CRNA Meyer's closing argument, Waechter's counsel objected to statements regarding:  images presented by the defense; Dr. Lowe being a "sure thing" and "the type of doctor you go to when you need the magic words to be said to a jury"; and Waechter's failure to meet her burden of proof regarding the LMA's ability to "lift an eight-pound head off [of] the table while under sedation with enough force to be similar to a motor vehicle accident, a fall or an assault." (Tr. 993, 1000, 1003, 1005).  In Waechter's final closing arguments, counsel commented, "So thank you for calling me the Wizard of Oz." (Tr. 1017.)

{¶ 28} The jury was excused, deliberations began.  In the afternoon of July 27, 2022, the jury returned a verdict in favor of the defense and the case was dismissed with prejudice.  In so deciding, all eight jurors unanimously answered the first interrogatory in the negative:  Waechter did not prove by a preponderance of the evidence that CRNA Meyer violated the accepted standard of care in his care and

treatment of Waechter by hyperextending her cervical spine during the placement of the LMA on December 15, 2017.

{¶ 29} On August 10, 2022, Waechter filed a motion for a new trial and for sanctions. CRNA Meyer opposed the motion. Waechter filed a reply and CRNA Meyer filed a sur-reply with leave of court. Waechter's motion for a new trial and for sanctions were denied by journal entry on September 28, 2022.

{¶ 30} On October 6, 2022, Waechter appealed, raising a single assignment of error for review:

> **Assignment of Error**: The trial court made error of law and abused its discretion and committed prejudicial error in not granting [Waechter's] motion for [a] new trial under Civ.R. 59(A)(1), (2), and (9).[3]

{¶ 31} In the event this court sustains Waechter's sole assignment of error and reverses the trial court's denial of Waechter's motion for a new trial, CRNA Meyer raises the following cross-assignment of error for review:

> **Cross-assignment of Error:** The trial court abused its discretion in failing to exclude Dr. Danielle Ludwin from testifying at trial pursuant to Evid.R. 615 thereby entitling [CRNA Meyer] to a directed verdict.

## II. Law and Analysis

### A. Civ.R. 59 Motion for a New Trial

{¶ 32} Waechter asks us to review the trial court's denial of her motion for a new trial following a defense verdict in her medical malpractice lawsuit. "To prevail

---

[3] Waechter did not file a direct appeal. Rather, Waechter only appealed the trial court's denial of her motion for a new trial pursuant to App.R. 4(B)(2)(b).

on a medical-malpractice claim, a plaintiff must establish, by a preponderance of the evidence, (1) the applicable standard of care; (2) a negligent failure by the defendant to render treatment in conformity with the standard of care; and (3) that the resulting injury was proximately caused by the defendant's negligence." *Geletka v. MetroHealth Sys.*, 2023-Ohio-934, 211 N.E.3d 704, ¶ 27 (8th Dist.), citing *Brush v. Eisengart*, 8th Dist. Cuyahoga No. 72999, 1999 Ohio App. LEXIS 3728, 4 (Aug. 12, 1999), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131-132, 346 N.E.2d 673 (1976); *Ulmer v. Ackerman*, 87 Ohio App.3d 137, 140, 621 N.E.2d 1315 (3d Dist.1993); *Avondet v. Blankstein*, 118 Ohio App.3d 357, 692 N.E.2d 1063 (8th Dist.1997).

{¶ 33} Waechter claims she is entitled to a new trial pursuant to Civ.R. 59(A)(1), (2), and (9). Civ.R. 59(A) establishes the grounds for a new trial. Relevant to this appeal, a new trial may be granted on any of the following grounds:

> (1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
>
> (2) Misconduct of the jury or prevailing party;
>
> * * *
>
> (9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

Civ.R. 59(A).

{¶ 34} Motions for a new trial "are not to be granted lightly." *State v. Jerido*, 8th Dist. Cuyahoga No. 72327, 1998 Ohio App. LEXIS 730, 5 (Feb. 26, 1998). "'Where competent, credible evidence supports the verdict, a trial court's denial of a

motion for a new trial does not constitute an abuse of discretion.'" *Professional Solutions Ins. Co. v. Novak, L.L.P.*, 8th Dist. Cuyahoga No. 108839, 2020-Ohio-4829, ¶ 47, quoting *Jawary v. Underwood*, 8th Dist. Cuyahoga No. 108424, 2020-Ohio-1272, ¶ 6, citing *Smith v. Sass, Friedmann & Assocs.*, 8th Dist. Cuyahoga No. 81953, 2004-Ohio-494, ¶ 37. "The standard of review we apply to a trial court's ruling on a Civ.R. 59 motion for a new trial depends on the grounds for the motion." *Yenni v. Yenni*, 8th Dist. Cuyahoga No. 111058, 2022-Ohio-2867, ¶ 60, citing *Robinson v. Turoczy Bonding Co.*, 8th Dist. Cuyahoga No. 103787, 2016-Ohio-7397, ¶ 23.

> "A motion for new trial brought under Civ.R. 59(A)(1), (2), (3), (4), (5), (6), or (8) is reviewed for an abuse of discretion. *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, ¶ 12, 13; *Johnson v. Johnson*, 5th Dist. Stark No. 2015CA00076, 2015-Ohio-4748, ¶ 16-17; *GMS Mgt. Co. v. Coulter*, 11th Dist. Lake No. 2005-L-071, 2006-Ohio-1263, ¶ 20-21. A motion for new trial brought under Civ.R. 59(A)(7) or (9), is reviewed de novo. *Gateway Consultants Group* at ¶ 12, 22."

*Id.*, quoting *Moore v. Moore*, 6th Dist. Erie No. E-17-011, 2018-Ohio-1545, ¶ 14.

{¶ 35} An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. "De novo review encompasses an independent examination of the record and law without deference to the underlying decision." *Gateway Consultants Group, Inc.*, at ¶ 22, citing *Demeraski v. Bailey*, 2015-Ohio-2162, 35 N.E.3d 913, ¶ 11 (8th Dist.).

{¶ 36} Here, Waechter claims she was entitled to a new trial based on Civ.R. 59(A)(1), an irregularity in the proceeding; (A)(2), the misconduct of the prevailing party; and (A)(9), an error of law occurring at trial despite being brought to the trial court's attention. While Waechter cites to sections (1), (2), and (9) of Civ.R. 59(A), she does not marry the issues raised on appeal to any of these grounds for a new trial; rather, Waechter makes broad assertions regarding the alleged violations that occurred without stating what section of Civ.R. 59(A) is applicable or providing specific support for it. Waechter first asserts counsel did thorough due diligence before filing the motion for a new trial. Waechter then argues that the trial court "abused its discretion and made error of law" when it (1) did not disqualify the defense's expert, Dr. Patil; (2) allowed defense counsel to use "an unauthenticated inaccurate 'medical illustration'"; and (3) "allowed [d]efense [c]ounsel to make persistent false and abusive comments" about Waechter's counsel and experts during opening statements and closing arguments. Waechter further claims that defense counsel made false statements about Dr. Picha's liability and trial testimony in opening statements and closing arguments and violated the Ohio Rules of Professional Conduct.

## 1. Due Diligence

{¶ 37} As an initial matter, Waechter asserts that her "counsel did thorough due diligence" before filing the motion for a new trial because he emailed and met with a retired Ohio Supreme Court Justice and filed her motion based on the analysis at that meeting. We note that in her motion for a new trial, Waechter

attached an email chain shared with the former justice and a summary of defense counsel's purported trial misconduct that Waechter claims was discussed at the meeting. However, counsel's due diligence is not part of this court's analysis of whether a trial court abused its discretion or made an error of law in its denial of a motion for a new trial. Therefore, we decline to consider Waechter's assertion.

## 2. Issue 1: Testimony of the Defense's Proximate Causation Witness

{¶ 38} Waechter argues that she is entitled to a new trial because the trial court erred when it allowed Dr. Patil, CRNA Meyer's proximate causation expert, to testify over her objection. Waechter claims that Dr. Patil, a neurosurgeon, offered testimony regarding anesthesiology despite being unqualified to testify as an "anesthesiology expert" pursuant to Evid.R. 601.

{¶ 39} "A trial court has discretion to determine whether a witness is competent to testify as an expert, and the trial court's decision will not be reversed absent a clear showing that the court abused its discretion." *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19; Evid.R. 104(A) ("Preliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court * * *."). Generally, "[e]very person is competent to be a witness * * *." Evid.R. 601(A). However, exceptions to that rule are found in Evid.R. 601(B), which establishes the parameters for disqualification of witnesses.

According to the version of Evid.R. 601(B)[4] in effect at the time of Waechter's trial in July 2022:

> A person is disqualified to testify as a witness when the court determines that the person is:
>
> * * *
>
> (5) A person giving expert testimony on the issue of liability in any medical claim, as defined in R.C. 2305.113, asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, unless:
>
> > (a) The person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state;
> >
> > (b) The person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school; and
> >
> > (c) The person practices in the same or a substantially similar specialty as the defendant. The court shall not permit an expert in one medical specialty to testify against a health care provider in another medical specialty unless the expert shows both that the standards of care and practice in the two specialties are similar and that the expert has substantial familiarity between the specialties.

The Staff Notes indicate

---

[4] Evid.R. 601 was amended in July 2023, after the culmination of this trial. The Staff Notes provide: "Division (B)(5)(b) is amended to clarify the time at which the active clinical practice requirement is needed to qualify the witness as an expert witness, in response to the Supreme Court of Ohio's ruling in *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304." 2023 Staff Note, Evid.R. 601. The amendments to Evid.R. 601, "filed by the Supreme Court with the General Assembly on January 10, 2023 and refiled on April 27, 2023 shall take effect on July 1, 2023. They govern all proceedings in actions brought after they take effect and also all further proceedings in actions then pending, except to the extent that their application in a particular action pending when the amendments take effect would not be feasible or would work injustice, in which event the former procedure applies." Evid.R. 1102(Y).

that the rule applies *only* to expert testimony as to *liability* in any medical claim, as defined by R.C. 2305.113, *asserted against a physician, podiatrist, or hospital* arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist. *The rule does not apply to expert testimony for any other medical claims*, or for any dental, optometric, or chiropractic claims, as defined by R.C. 2305.113.

(Emphasis added.) 2016 Staff Note, Evid.R. 601.

{¶ 40} Moreover, the purpose of Evid.R. 601(B)(5), formerly Evid.R. 601(D),[5] is to discourage testimony regarding the proper standard of care by a "professional witness" or a physician who is sequestered in the laboratory and has no firsthand knowledge of the duty of care of patients. *Joyce-Couch v. DeSilva*, 77 Ohio App.3d 278, 292, 602 N.E.2d 286 (12th Dist.1991). The rule seeks to prevent "nonclinicians from testifying about the quality of clinical care." *Id.*, quoting *Price v. Cleveland Clinic Found.*, 33 Ohio App.3d 301, 304, 515 N.E.2d 931 (8th Dist.1986). But the rule should not be "applied so narrowly that the right of redress in a medical claim collapses under an undue burden." *Crosswhite v. Desai*, 64 Ohio App.3d 170, 177, 580 N.E.2d 1119 (2d Dist.1989). Moreover, courts have interpreted "liability" in this context to mean fault, or duty and breach of duty; these issues are separate and distinct from the issues of causation and damages. *Melvin v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 10AP-975, 2011-Ohio-3317, ¶ 29 (holding Evid.R. 601(D) precludes non-clinician experts from testifying about duty and breach but does not preclude a non-clinician expert from testifying about

---

[5] Evid.R. 601(B)(5) was formerly known as Evid.R. 601(D) prior to 2016, when nonsubstantive revisions to the rule were made. 2016 Staff Note, Evid.R. 601. Because the substance of the rule is the same, analysis of Evid.R. 601(D) is applicable to Evid.R. 601(B)(5).

causation and damages), citing *Lessler v. Ohio State Univ. Hosps.*, 10th Dist. Franklin No. 96API10-1276, 1997 Ohio App. LEXIS 1972 (May 8, 1997), citing *McCrory v. State*, 67 Ohio St.2d 99, 104, 423 N.E.2d 156 (1981) (addressing the experts who may testify as to "fault or liability" under the rule), and *Wise v. Doctors Hosp. N.,* 7 Ohio App.3d 331, 333-334, 455 N.E.2d 1032 (10th Dist.1982); *see also Karpinski v. Lim*, 7th Dist. Columbiana No. 03 C0 64, 2004-Ohio-3037, ¶ 8 (stating that "[m]any courts have defined the use of the word 'liability' in this rule as: fault, duty and breach, or standard of care").

{¶ 41} Here, Waechter argues that it was error of law for the trial court to deny her motion to disqualify Dr. Patil and allow him to offer testimony about "anesthesiology issues" at trial "because Dr. Patil does not meet the three criteria for an anesthesiology expert in Evid.R. 601." CRNA Meyers argues that "Dr. Patil opined solely on the issue of proximate cause of [Waechter's] spinal cord injury during the course of direct examination" and that Waechter "opened the door to the standard of care testimony" because Waechter directed Dr. Patil to read into the record portions of his expert report on cross-examination that were not discussed during direct examination.

{¶ 42} "The 'invited error doctrine' prohibits a party from raising an error on appeal which she herself invited or induced the trial court to make." *In re Gray*, 8th Dist. Cuyahoga Nos. 75984 and 75985, 2000 Ohio App. LEXIS 1734, 4 (Apr. 20, 2000) (applying the invited-error doctrine when the testimony complained of was offered in response to a question posed by appellant's own attorney), citing *State ex*

*rel. Fowler v. Smith,* 68 Ohio St.3d 357, 359, 626 N.E.2d 950 (1994), and *Ctr. Ridge Ganley, Inc. v. Stinn* , 31 Ohio St.3d 310, 313, 511 N.E.2d 106 (1987). The doctrine, which is applied when counsel is "actively responsible" for the trial court's error, stands for the proposition that "'a litigant cannot be permitted, either intentionally or unintentionally[,] to induce or mislead a court into the commission of an error and then procure reversal of the judgment for an error for which he was actively responsible.'" *Yuse v. Yuse*, 8th Dist. Cuyahoga No. 89213, 2007-Ohio-6198, ¶ 14, quoting *State v. Campbell,* 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000) and *Lester v. Leuck*, 142 Ohio St. 91, 93, 50 N.E.2d 145 (1943).

{¶ 43} Here, the record reveals that on direct examination Dr. Patel, a neurosurgeon and associate professor in anesthesiology, biomedical engineering, neurology, and neurosurgery, testified to his opinions that Waechter's spinal cord injury was caused by Dr. Picha and was an inadvertent intraoperative injury; Waechter's cervical spine was not hyperextended causing injury during placement of the LMA; CT scans confirmed that the free air present in both Waechter's brain and spine were caused by Dr. Picha's inadvertent intraoperative injury; Waechter's neurological injury was a known and recognized complication of the surgery performed; Waechter did not have an unstable spine; and the placement of the LMA did not cause Waechter's spinal injury. We find that these opinions are routed in his expertise, neurosurgery, and are limited to the damages issue of proximate cause. Dr. Patil did not offer any testimony regarding the appropriate standard of care until cross-examination, when Waechter's counsel raised the issue and elicited Dr. Patil's

testimony about it. Even then, Dr. Patil clarified that his opinion was based on neurosurgery perspective. Nevertheless, Waechter now claims that "[a]llowing Dr. Patil to be the [d]efense expert on anesthesiology standard of care and the breach of the standard of care prejudice[d] [her] and affected the verdict." Because Waechter's counsel opened the door to the standard-of-care testimony she now complains of and invited the alleged error, we find that her argument lacks merit.

{¶ 44} Moreover, Waechter did not file a motion to disqualify Dr. Patil until days before his testimony was offered and, despite the absence of a definitive ruling at the time of Dr. Patil's testimony, Waechter did not raise the motion or further assert the arguments contained therein until after Dr. Patil was excused. Nor did Waechter object to any of Dr. Patil's qualifications or opinions when Dr. Patil's testimony was offered. Waechter did not bring the motion to disqualify to the court's attention until after Dr. Patil's testimony was completed. The trial court ruled that the motion to disqualify was untimely. Based on the record before us, we cannot say the trial court exercised its discretion in an unwarranted way or manner in so ruling.

{¶ 45} Finally, we note that Waechter's medical malpractice claim proceeded to trial only against a registered nurse, CRNA Meyer, not "a physician, podiatrist, or hospital" as prescribed by Evid.R. 601(B)(5). Nor did Dr. Patel offer testimony regarding issues of "liability" on direct examination; rather, Dr. Patel offered testimony regarding the damages issue of proximate cause, an issue outside of the scope of Evid.R. 601(B)(5). Any testimony offered by Dr. Patil regarding his standard-of-care opinions was incited on cross-examination, when Waechter's

counsel invited the error. Therefore, we do not find the trial court abused its discretion or otherwise erred in allowing Dr. Patil to testify.

### 3. Issue 2: Use of the Illustration

{¶ 46} Second, Waechter argues that she is entitled to a new trial because the Illustration presented by the defense at trial was unauthenticated, inaccurate, deceptive, confusing, and highly prejudicial. Waechter claims that the Illustration was fabricated, anatomically inaccurate, not properly marked or drawn to scale, and shown upside down. Waechter claims that the Illustration "confused and deceived [the jury] into accepting [the defense's] arguments that Dr. Picha's instruments penetrated Mrs. Waechter's cervical spinal cord, and therefore, that * * * CRNA Meyer should not have been sued." CRNA Meyer maintains that the use of demonstrative exhibit at trial is within the discretion of the trial court and, regardless of whether the demonstrative exhibit was admitted as evidence or simply used at trial, Waechter had to object to the exhibit if she planned to seek reversal.

{¶ 47} Demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evid.R. 401,[6] is not subject to exclusion pursuant to Evid.R. 403,[7] and is substantially similar to the object or occurrence that it is intended to represent. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984

---

[6] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401.

[7] "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

N.E.2d 948, ¶ 82, citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 90, and *State v. Palmer*, 80 Ohio St.3d 543, 566, 687 N.E.2d 685 (1997). It is within the trial court's discretion to determine whether demonstrative evidence is helpful or misleading to the trier of fact and the trial court's ruling is reviewed under an abuse-of-discretion standard on appeal. *Id.*, citing *State v. Cowans*, 87 Ohio St.3d 68, 77, 717 N.E.2d 298 (1999), and *State v. Herring*, 94 Ohio St.3d 246, 255, 762 N.E.2d 940 (2002). But "[a] party must generally raise a timely objection to preserve a claim of error." *Di v. Cleveland Clinic Found.*, 2016-Ohio-686, 60 N.E.3d 582, ¶ 106 (8th Dist.), citing *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 543 N.E.2d 464 (1989). Failing to raise an objection waives all but plain error. *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209, 436 N.E.2d 1001 (1982). "To constitute plain error, the error must be obvious on the record, palpable, fundamental, so that it should have been apparent to the trial court without objection." *Peffer v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 94356, 2011-Ohio-450, ¶ 61. Additionally, an appellant must show that the outcome of the trial would have been different but for the allegedly improper actions to obtain reversal under plain error review. *Id.* In civil cases,

> the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where [the] error * * * seriously affects the basic fairness, integrity, or public reputation of the judicial process [and challenges] the legitimacy of the underlying judicial process itself.

*Goldfuss v. Davidson*, 79 Ohio St.3d 116, , 679 N.E.2d 1099 (1997), syllabus.

{¶ 48} Our review of the record, which did not include the Illustration, indicates that while Waechter's counsel initially objected to the use of the demonstrative exhibit, the objection was subsequently withdrawn. Moreover, it appears the Illustration was used in very limited context during Dr. Patil's direct examination and did not appear again until Dr. Patil's extensive cross-examination and closing argument, wherein Waechter's counsel requested the Illustration be shown again. As discussed above, failing to raise an objection waives all but plain error. And absent a showing that the outcome of the trial would have been different but for the allegedly improper actions, Waechter cannot obtain reversal under plain error review. Here, Waechter does not claim or argue that the outcome of trial would have been different. Waechter merely speculates that jury was "confused and deceived." Therefore, even if the use of the allegedly inaccurate Illustration constituted plain error, Waechter has not made the requisite showing for reversal. Accordingly, we decline to find plain error.

### 4. Issue 3: Defense Counsel's Comments in Opening Statements and Closing Arguments

{¶ 49} Next, Waechter claims she is entitled to a new trial because the trial court allowed defense counsel to make the following purportedly false and prejudicial assertions and comments in opening statements and closing arguments: (1) Dr. Picha, the nonparty orthopedic surgeon who performed Waechter's surgery, admitted that he inadvertently injured Waechter's cervical spinal cord; (2) Waechter's counsel withheld evidence and manipulated expert witnesses; (3)

Waechter's counsel is akin to the Wizard of Oz because he fabricated a meritless medical malpractice lawsuit and wasted seven days of the jury's time; and (4) Waechter's experts "turn a courtroom into their personal ATMs." Waechter claims that defense counsel's alleged attacks on her counsel as well as her experts inflamed the jury.

{¶ 50} It is well-settled that counsel is accorded wide latitude in opening statements and closing arguments subject to the restriction that it is impermissible to comment on incompetent, inadmissible, or improper evidence that is patently harmful. *Hunt v. Crossroads Psych. & Psychological Ctr.,* 8th Dist. Cuyahoga No. 79120, 2001 Ohio App. LEXIS 5388, 7-8 (Dec. 6, 2001), citing *Dillon v. Bundy*, 72 Ohio App.3d 767, 772, 596 N.E.2d 500 (10th Dist.1991), citing *Maggio v. Cleveland*, 151 Ohio St. 136, 84 N.E.2d 912 (1949), paragraph two of the syllabus, *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraphs two and three of the syllabus, and *Drake v. Caterpillar Tractor Co.*, 15 Ohio St.3d 346, 348, 474 N.E.2d 291 (1984). This court explained:

> The determination of whether or not the proper bounds of closing arguments have been breached is a pure function of the trial court, therefore, this court must look at the court's ruling under an abuse of discretion standard. Only if the circumstances are of such reprehensible and heinous nature as to constitute prejudice will this court reverse a judgment.

*Id.* at 8, citing *Kubiszak v. Rini's Supermarket*, 77 Ohio App.3d 679, 688, 603 N.E.2d 308 (1991), citing *Hitson v. Cleveland,* 8th Dist. Cuyahoga No. 57741, 1990 Ohio App. LEXIS 5466 (Dec. 13, 1990). Generally, failure to raise a timely objection

"prevents reversal absent gross and persistent abuse of counsel's privilege in closing argument." *Di*, 2016-Ohio-686, 60 N.E.3d 582 at ¶ 106, citing *Snyder v. Stanford*, 15 Ohio St.2d 31, 238 N.E.2d 563 (1968). But an appellant, who failed to raise a timely objection, may obtain a new trial if "'gross and abusive conduct occurr[ed] [because] the trial court is bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.'" *Id.* at ¶ 105, quoting *Caruso v. Leneghan*, 8th Dist. Cuyahoga No. 99582, 2014-Ohio-1824.

{¶ 51} Here, Waechter argues that defense counsel's comments during opening and closing arguments constitute gross and abusive conduct and the trial court was bound to correct the prejudicial effect of counsel's misconduct. CRNA Meyer argues that defense counsel's conduct was not gross and abusive and maintains that the trial court did not abuse its discretion with affording the parties great latitude in opening statements and closing arguments.

{¶ 52} Our review of the record reveals that Waechter objected five times in opening statements to comments pertaining to (1) the length of CRNA Meyer's counsel's career; (2) the amount of money one of Waechter's experts made for her testimony; (3) the future cross-examination of another one of Waechter's experts being "an interesting thing to watch" and an advisement that the jury will "be able to formulate an opinion about [the expert's] believability, honesty, his credibility"; (4) Dr. Picha's alleged admission that Waechter's "dural injury was most likely caused by his surgery"; and (5) Waechter's counsel's "manipulat[ion of] experts and with[olding of] evidence." Following a sidebar, the last objection was sustained and

the jury was advised to disregard defense counsel's comment. During closing arguments, Waechter's counsel objected to statements regarding: (1) images presented by the defense; (2) Dr. Lowe being a "sure thing" and "the type of doctor you go to when you need the magic words to be said to a jury"; and (3) Waechter's failure to meet her burden of proof regarding the LMA's ability to "lift an eight-pound off [of] the table while under sedation with enough force to be similar to a motor vehicle accident, a fall or an assault." In closing arguments, Waechter's counsel did not object to arguments made regarding Dr. Picha's alleged liability and testimony; comments that Waechter's counsel was withholding or manipulating experts and evidence; and comparisons to the Wizard of Oz. Absent objections, we again review for plain error and find no obvious, palpable, or fundamental gross and persistent abuse.

{¶ 53} Our review of the record further reveals that both Dr. Ludwin and Dr. Lowe offered testimony about their expert practices, fees, incomes, and opinions, allowing the jury to make its own, independent determination regarding the witnesses' credibility, veracity, and biases. On cross-examination, Dr. Picha agreed that it was more probable than not that, given Waechter's surgery, air was let in by some opening in the dura, although he did not specifically attribute the injury to the surgery he performed. Testimony was also offered by Dr. Picha that he was not given any of Waechter's images or films taken of Waechter prior to cross-examination. Dr. Lowe further testified that he did not review intraoperative x-rays of Waechter's surgery while Dr. Ludwin advised that she was not provided with and did not review

Waechter's films. Based on the foregoing, we decline to find that the latitude given to defense counsel by the trial court was improper. Defense counsel merely presented CRNA Meyer's arguments and commented on the credibility, veracity, and biases of Waechter's experts. The jury was left to consider the evidence and testimony offered at trial and was instructed on multiple occasions that comments made during opening statements and closing arguments were not evidence. Accordingly, the trial court did not abuse its discretion or err; the comments made by defense counsel did not rise to the level of gross and persistent abuse and were not impermissible, incompetent, inadmissible, improper, reprehensible, or heinous in such a way to amount to prejudice.

### 5. Issue 4: Waechter's Allegations of Professional Conduct Rule Violations

{¶ 54} Lastly, Waechter argues that she is entitled to a new trial because defense counsel committed a number of professional conduct rule violations.

{¶ 55} "Trial courts have a 'duty in the executive control of the trial to see that counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished.'" *Professional Solutions Ins. Co.*, 8th Dist. Cuyahoga No. 108839, 2020-Ohio-4829 at ¶ 46, quoting *Pesek v. Univ. Neurologists Assn.*, 87 Ohio St.3d 495, 501, , 721 N.E.2d 1011 (2000). "Only 'where gross and abusive conduct occurs, is the trial court sua sponte bound to correct the prejudicial effect of counsel's misconduct.'" *Id.* at ¶ 47, quoting *id.* at 501. The dispositive question is: was the

verdict rendered on the evidence, or was the verdict influenced by improper remarks of counsel? *Id.* at ¶ 53, citing *Wynn v. Gilbert*, 1st Dist. Hamilton No. C-060457, 2007-Ohio-2798, ¶ 34, and *Pesek* at 502. "The determination of misconduct by counsel is within the sound discretion of the trial court." *Id.* at ¶ 51, citing *Pierson v. Hermann*, 3 Ohio App.2d 398, 400, 210 N.E.2d 893 (10th Dist.1965).

{¶ 56} Here, Waechter asserts that defense counsel violated Prof.Cond.R. 3.3 by "falsifying evidence at trial with a fraudulent medical illustration to intentionally mislead the court and jury" and telling the jury in opening statements and closing arguments that Dr. Picha admitted that he caused Waechter's spinal cord injury. Waechter further claims defense counsel violated Prof.Cond.R. 3.4 by "habitually fil[ing] multiple motions in limine that contained false statements of statutes and facts"; making comments and showing a slide in opening statements and closing arguments that Waechter's counsel withheld evidence and manipulated expert witnesses; and changing the jury interrogatories between Waechter's stipulation to them and their filing. Finally, Waechter claims defense counsel violated Prof.Cond.R. 3.5 by being "verbally abusive to [Waechter's] counsel during the trial and us[ing] profanities directed at [Waechter's] counsel that the jury could hear."

{¶ 57} Based on our review of the record and the foregoing analysis, we do not find that defense counsel prejudicially lacked candor, was unfair to Waechter or her attorney, or lacked impartiality and decorum to constitute the need for a new trial. The trial court warned counsel that it would not tolerate personal attacks,

sustained objections when appropriate, and instructed the jury to disregard comments that may have been improper and consider only the evidence. Moreover, the record indicates that the parties agreed upon the final jury instructions, interrogatories, and verdict forms. This included an agreement to withdraw an instruction discussing nurses' duties. Defense counsel also voluntarily advised the trial court that a version of the jury instructions submitted to the court should have included future pain and suffering, the defense had no objection to its inclusion, and a revised final version was being prepared and delivered. Consequently, we decline to find that gross and abusive conduct occurred or influenced the verdict.

{¶ 58} Because we find that none of the issues raised by Waechter provided grounds for a new trial, we decline to find that the trial court abused its discretion or erred when it denied Waechter's motion for a new trial under Civ.R. 59(A)(1), (2), and (9). Accordingly, Waechter's sole assignment of error is overruled.

## A. Cross-assignment of Error

{¶ 59} In his cross-assignment of error, CRNA Meyer argues that the trial court abused its discretion in failing to exclude Dr. Ludwin from testifying at trial pursuant to Evid.R. 615, which governs the separation and exclusion of witnesses so they cannot hear the testimony of other witnesses. CRNA Meyer asserts that the exclusion of Dr. Ludwin, Waechter's only standard-of-care expert witness, entitles him to a directed verdict in the event this court reverses the trial court's denial of Waechter's motion for a new trial. However, because we have considered all of the issues raised by Waechter, find that none of them present grounds for a new trial,

overrule her sole assignment of error, and affirm the trial court's ruling, we decline to address CRNA Meyer's cross-assignment of error.

## III.   Conclusion

{¶ 60} After reviewing the record, we conclude that the trial court properly denied Waechter's motion for a new trial under Civ.R. 59(A)(1), (2), and (9).  The trial court did not abuse its discretion or err when it allowed Dr. Patil, CRNA Meyer's proximate cause expert witness, to testify; found that Waechter's motion to disqualify Dr. Patil was untimely; permitted the use of the Illustration; and provided defense counsel with wide latitude to present opening statements and closing arguments.  We find that Waechter's counsel invited error by opening the door to Dr. Patil's standard-of-care testimony on cross-examination and that his testimony on direct examination was not contrary to Evid.R. 601(B)(5).  We further find that Waechter withdrew her objections or failed to object to the use of the Illustration and to many of the allegedly false and prejudicial comments made by defense counsel during opening statements and closing arguments.  We decline to find plain error in those instances.  Nor do we find that defense counsel lacked candor, was unfair to Waechter or her attorney, or lacked impartiality and decorum to constitute the need for a new trial.  Thus, we cannot say that the trial court abused its discretion or committed error of law when it denied Waechter's motion for a new trial.

{¶ 61} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

MARY EILEEN KILBANE, P.J., and
MICHAEL JOHN RYAN, J., CONCUR